## NELLO L. TEER COMPANY v. DICKERSON, INC.

(Filed 10 July 1962.)

**1. Evidence § 50—**

It is competent for an expert accountant to testify as to what the books examined by him disclosed as to the amount due by defendant to plaintiff, the entries in the books of defendant being competent as admissions and the accountant's testimony not purporting to state the ultimate fact as to the amount due, if any, by defendant to plaintiff.

**2. Account Stated § 1—**

An agreement between the parties as to the amount or balance due by the one to the other as the result of prior transactions between them constitutes an account stated.

**3. Account Stated § 2—**

An account stated constitutes a new and independent cause of action conclusive upon the parties in the absence of fraud or mistake, but the agreement as to the amount due cannot preclude items not included in the account or a claim for adjustment agreed upon at that time to be the subject of subsequent negotiation.

**4. Account Stated § 1—**

Failure to object to an account within a reasonable time may amount to an acquiescence constituting it an account stated, but what is a reasonable time is to be determined upon the basis of the circumstances of each case, and is ordinarily a question for the jury, certainly when there is conflict in the evidence or if adverse inferences may be drawn therefrom.

**5. Account Stated § 2—**

Where defendant's evidence is to the effect that the parties had reached an agreement as to the amount due upon the account in suit but that at that time it was agreed that defendant's claim of an offset for failure of the material furnished by plaintiff to meet the specifications should be subject to later negotiation, it is error for the court to instruct the jury to the effect that the account had become an account stated by reason of defendant's failure to object thereto within a reasonable time without further instructing the jury upon defendant's contention that defendant

was not precluded from asserting an adjustment or counterclaim for failure of the material furnished to meet the specifications.

**6. Appeal and Error § 45—**

An erroneous instruction on one issue must be held prejudicial even though such instruction may not have affected the jury's answer to such issue if it is apparent from the record that such instruction must have influenced the jury in their answers to subsequent issues.

**7. Contracts § 29;   Damages § 5—**

Where the contract specifically provides that if defendant could not furnish the subject materials in the quantities needed by plaintiff in plaintiff's performance of his contract with a third person, plaintiff should purchase the additional materials needed on the open market, plaintiff may not recover any damages for delay in the performance of his contract with such third person because of defendant's failure to furnish the materials in the quantity required, since it is clear that damages for such delay were not within the contemplation of the parties when the contract was made.

APPEAL by defendant from *Williams, J.,* May 1961 Civil Term of DURHAM.

Plaintiff instituted this action on December 3, 1958 to recover the principal sum of $10,720.90, the balance it alleged to be due for crushed aggregate (rock) furnished defendant in November 1957 for use in supplying asphalt for North Carolina Highway Project No. 2435, Johnston-Sampson Counties. The rock was furnished under an express contract consisting of a purchase order dated April 2, 1954 from defendant to plaintiff and an acknowledgment of this order by the defendant on April 6, 1957.

The purchase order contained the following:

"This purchase order is based upon the firm guarantee made by Nello L. Teer Company that a minimum of 50% of the job requirements of coarse aggregate and screenings will be available at the Princeton Quarry not later than August 1, 1957 at the rate of 800 tons per day (total aggregates). Should the seller, Nello L. Teer Company, be unable to fulfill this guarantee any cost incurred by the purchaser, Dickerson, Inc., over and above his delivered cost to asphalt plant will be for the account of the seller. It is further guaranteed that approximately 50% of the estimated job requirements of coarse aggregates and screenings are currently available from the seller's Raleigh quarry and Erwin gravel pit in quantities of not less than 800 tons per day (total aggregates).

"The seller further guarantees that the purchaser may secure all of the coarse aggregates and screenings from the Princeton quarries after August 1, 1957 at the rate of 800 tons per day

(total aggregates); however, if these materials are available at the Princeton Quarry prior to August 1, 1957 the purchaser has the right to request delivery from there at the above rate at the time the materials are available."

The acknowledgment provided that plaintiff would furnish the defendant, F. O. B. from its quarries at Raleigh, Princeton or Erwin its total requirements of coarse aggregates and screenings for project No. 2435 at specified amounts per ton when called for at the rate of 800 tons daily. The acknowledgment provided "If seller unable to furnish from own quarries, the right is reserved for seller to purchase on open market then if unable to procure same, purchaser has right to purchase on open market."

In its answer defendant admitted that it purchased aggregates from the plaintiff under an express contract and took delivery of same. However, it alleged that the aggregates did not meet the required specifications and were not worth the agreed price. It, therefore, denied that it was indebted to the plaintiff in the amount sued for. As a setoff and counterclaim defendant alleged: (1) that plaintiff failed to deliver the aggregate within the time specified thereby delaying the defendant's work to its damage in the sum of $21,441.40; and (2) that because the aggregate did not come up to the specifications, defendant was required to use more aggregate and less screenings to its damage in the sum of $9,454.75. Defendant prayed for a recovery in the sum of $30,986.15.

Plaintiff replied, alleging in substance: (1) that at all times it had available at its Raleigh, Erwin, and Princeton quarries aggregate sufficient to fill defendant's orders and did deliver it to defendant as ordered; (2) that the written contract of April 2, 1957 which bound plaintiff to furnish defendant at least 800 tons of aggregate per day after August 1, 1957 from its Princeton quarry, was verbally altered prior to August, 1957; that in order to save transportation cost defendant desired to purchase all the aggregate from the Princeton quarry and, in consideration of plaintiff's furnishing it there, the defendant agreed to coordinate its work with the ability of the Princeton quarry to produce; that defendant did this and plaintiff furnished all the necessary material for the job; that even had plaintiff failed to deliver the needed aggregate, under the contract, it would have been the duty of the defendant to procure it elsewhere; (3) that prior to August 1, 1957 plaintiff allegedly delivered to defendant a small amount of crushed aggregate containing more screenings than the parties contemplated; that this matter was adjusted on September 21, 1957 when plaintiff gave defendant a credit of $838.18 in full settlement; that

thereafter defendant took delivery of over $200,000.00 worth of aggregate without complaint and is thereby estopped to complain now; (4) that plaintiff sent defendant various invoices and, since December 1, 1957, defendant has paid plaintiff over $200,000.00 on its account; that at the end of each month during the period defendant purchased crushed aggregate from plaintiff, plaintiff furnished defendant with copies of all invoices and with monthly statements showing the exact amount of the remaining balance due plaintiff; that defendant continued to make purchases and payments and as a result the defendant's account with plaintiff became an account stated.

The amount for which the plaintiff sues is made up of two invoices, one dated November 16, 1957 for 1,983.3 tons of No. 11 aggregate for $4,859.09; the other, dated November 23, 1957 for 2,339.7 tons of No. 11 aggregate (plus 107.95 tons of screenings) for $5,861.81, making a total of $10,720.90.

Complying with a notice to produce, defendant brought to the trial the ledger sheets showing its account with plaintiff. Mr. A. B. Umstead, plaintiff's chief accountant in charge of its bookkeeping and records, was admitted to be an expert accountant. He examined defendant's records and explained its system of bookkeeping. He also explained the plaintiff's system. The two systems did not vary appreciably. Plaintiff would send an invoice to the defendant; defendant would record it on a ledger sheet entitled "The Nello L. Teer Company" as an account payable to the plaintiff. At the trial the books of both companies showed the two unpaid invoices totaling $10,720.90 to be due the plaintiff. They went on the defendant's ledger on December 31, 1957. On that date, including these two invoices, the defendant owed plaintiff $78,658.94. Between that date and the institution of this action, plaintiff sent defendant 127 invoices and, in thirteen payments, the defendant paid plaintiff in excess of $200,000.00. After project No. 2435 was completed — the record does not contain this date — the defendant continued to purchase aggregate for other jobs from plaintiff.

Beginning February 1, 1958 plaintiff's auditor started sending monthly statements to the defendant. Every statement contained the $10,-720.90 item. No protest was ever made to him that defendant did not owe the account. There was nothing on the books of defendant at any time to show that it was in dispute. In conformity with approved auditing practices, the independent accountant auditing defendant's books requested confirmation from plaintiff that the amount of $10,-720.90 was due. On April 30, 1960 plaintiff's auditor advised defendant that the amount was due and unpaid. Defendant's auditor did not know of the controversy but he testified that even though the account

were in controversy it would be normal practice to leave it on the books until it was finally settled.

At the trial defendant conceded that the aggregates specified on the two invoices were received and used. With reference to these two items, N. K. Dickerson, the chairman of defendant's board, testified, "These aggregates were used by our company; we don't question that." He further testified, "Our books and records show, for bookkeeping purposes, that after proper invoicing and proper credits were made on our account, * * * that our company owed Nello L. Teer Company the sum of $10,720.90." Defendant contended that these invoices were not paid because they amounted to approximately the sum which plaintiff owed defendant because the aggregate furnished on the whole project after September 21, 1957 was "out of specification." On cross-examination Dickerson said: "I testified that I received the aggregate, that I received the invoices, and that I used every bit of the aggregate, that I would not allow the correct amount to be paid because I had not received the adjustment."

Defendant's evidence tended to show the following situation:

The two invoices in question cover 4,323 tons of No. 11 aggregate. Defendant used 23,072.3 tons of No. 11 aggregate on project No. 2435. All the aggregate furnished by the plaintiff, both No. 4 and No. 11, was finer than specified by the contract, and for that reason the defendant had to cut down on the cheaper screenings and local sand and to use more expensive stone in order to provide an asphalt mix which would comply with State Highway specifications.

Complaints were frequently made to Mr. Champion, plaintiff's sales manager, and to Mr. Dean, superintendent of the Princeton quarry. As a result, on September 21, 1957, Champion and H. G. Shirley, defendant's vice-president and general manager, agreed on an adjustment of $838.18 in settlement of claims up to that time. Defendant was assured that from then on the aggregate would be satisfactory, but it was not. On or about October 4th, Dickerson and Shirley met with Champion and Dean to discuss the matter further. At that time Champion told defendant's representatives that if they would continue to use aggregate from the Princeton quarry, upon completion of the project they would go over the situation and work out an equitable adjustment if excessive amounts had been required. As a result of that conversation, defendant continued to use the material.

After the job was completed Dickerson informed Champion that he was withholding payment of several invoices pending the adjustment they had discussed. Thereafter the matter was discussed on about five different occasions. Once Champion suggested that defendant be given a credit of from four to five thousand dollars in settlement, but de-

fendant refused this offer. On July 7, 1958, the parties attempted to work out a settlement at a conference in Monroe. At this conference plaintiff had the advice of an independent paving expert whom it had employed to check the job and advise plaintiff what its obligations were. No agreement was reached. Defendant claimed it was entitled to an offset of $9,454.76 on the two unpaid invoices because all the aggregate furnished after September 21, 1957 was "out of specification"; plaintiff contended that the aggregate was according to specification and that no excessive amount was required.

In addition to the two invoices dated November 16th and 23rd, there was one other invoice which remained unpaid after the completion of the job, an invoice dated November 9, 1957 in the amount of $7,380.13. This invoice was paid on October 25, 1958 after plaintiff's sales manager had pointed out to defendant that it was holding a total of nearly $18,000.00 in unpaid invoices which was in excess of the amount in dispute between them.

Neither at the July conference, nor in any previous discussion, did defendant ever make any claim for damages on account of delay in receiving sufficient quantities of aggregate. Its claim related only to the aggregate being "out of specification." Dickerson testified that defendant first made a claim for damages for delay in its answer.

On the trial defendant's evidence tended to show that it had intended to begin producing asphalt for project No. 2435 on August 14, 1957, but was delayed until September 20th because aggregate only became available at plaintiff's Princeton quarry in limited quantities about September 3, 1957. Defendant contended that, including working hours lost because the days became shorter as winter approached, it thereby lost forty-seven days work on the project.

Under its contract with the State, the defendant had 185 days in which to finish its work on project No. 2435; it used 180 days. Plaintiff furnished from its Princeton quarry all the coarse aggregate which was needed and used on the job.

The Chairman of the Board of Dickerson, Inc., the defendant, testified that the contract contemplated and "set forth that if Teer couldn't, (furnish the aggregate) we would purchase somewhere else and Teer would have to pay us the difference."

The defendant tendered two issues: (1) What amount, if any, is the plaintiff entitled to recover of the defendant, and (2) What amount, if any, is the defendant entitled to recover of the plaintiff. The judge refused these issues.

Issues were submitted to the jury and answered as follows:

"1. Is the defendant Dickerson, Inc. indebted to the plaintiff Nello L. Teer Company in the sum of $10,720.90, plus interest, for crushed aggregates, as alleged in the Complaint?

"ANSWER: Yes.

"2. Did the plaintiff Nello L. Teer Company breach its contract with the defendant by failing to furnish the materials purchased by the defendant within the time specified, as alleged in the defendant's Counterclaim?

"ANSWER: No.

"3. Did the crushed aggregates and screenings purchased by the defendant fail to meet the required specifications, as alleged in the defendant's Counterclaim?

"ANSWER: No.

"4. Is the defendant estopped from making any claim by reason of an 'account stated'?

"ANSWER: _____

"5. Did the defendant Dickerson, Inc. waive any claim it might have against the plaintiff by failure to minimize its damages?

"ANSWER: _____

"6. Is the defendant estopped from asserting any claim against the plaintiff by reason of its continually purchasing and paying for aggregates without complaint?

"ANSWER: _____

"7. Did the defendant waive its right to any claim against the plaintiff by reason of a compromise and settlement September 21, 1957, as alleged?

"ANSWER: _____

"8. What amount, if any, is the defendant entitled to recover of the plaintiff for delay in delivery or for inferior materials purchased and used by the defendant?

"ANSWER: _____ "

From judgment on the verdict, the defendant appealed assigning 152 errors.

*Charles B. Nye and Watkins and Jarvis for plaintiff appellee.*
*McCleneghan, Miller and Creasy and Bryant, Lipton, Bryant and Battle for defendant appellant.*

SHARP, J. Assignments of error 1 through 13 relate to the testimony of plaintiff's auditor who interpreted the ledgers of both plaintiff and defendant. The purport of his testimony was that the books of both corporations showed that the defendant owed the plaintiff the two invoices totaling $10,720.90.

Entries in the books of the defendant were clearly admissible against it as admissions. Stansbury on Evidence, Section 156. It was permissible for the auditor, an expert accountant, to interpret the books and testify what the books showed; he did not purport to say what amount was, in fact, due. Whether the books were correct or not, in the absence of a stipulation, was, of course, for the jury. In *LaVecchia v. Land Bank,* 218 N.C. 35, 41, 9 S.E. 2d 489, an expert accountant, after examining the books of a corporation, testified that they did not indicate that the corporation was indebted to its president in any amount. The court said: "The witness being an expert accountant, his testimony, based upon personal examination of the books and records of the corporation, is clearly competent." Assignments of error 1 through 13 are not sustained.

In the instant case, although the record contains no such stipulation, there seems to be no dispute between the parties that the two invoices in suit represent crushed stone in the amount of $10,720.90 delivered by plaintiff to the defendant and used by it. The defendant offered no evidence of any difference in the value of the aggregate delivered (which it claims did not meet specifications) and the aggregate specified in the contract. Its complaint is that because the aggregate did not meet specifications, more of it had to be used. Defendant contends that it is entitled to a setoff for the excess used.

The plaintiff contends that all the aggregate it delivered to defendant did meet specifications but that, in any event, on September 21, 1957 it had compromised and settled the defendant's claim that it did not. On the trial the defendant's general manager conceded that all claims prior to September 21st had been compromised, but defendant offered evidence tending to show that thereafter the aggregate continued "out of specification"; that there was another conference early in October between plaintiff's sales manager and defendant's chairman at which it was agreed that defendant would continue to use aggregate from the Princeton quarry but, at the completion of the project, plaintiff would make "an equitable adjustment" if the aggregate failed to meet specifications. The essence of this controversy is whether the aggregate furnished after September 21st met specifications and, if it didn't, what amount would be an "equitable adjustment" for the excess required.

The plaintiff's theory of this case is, (1) that the two invoices in suit had become an account stated because defendant, which received periodic statements of its account with plaintiff, never protested to plaintiff's business office that those two items shown thereon were not due, and (2) that the account stated is not subject to a setoff or counterclaim. However, this conclusion does not necessarily follow. The

defendant's theory of the case seems to be that although it did not dispute the amounts plaintiff had charged it for the aggregate represented by the two invoices, those charges did not represent an *account stated* in the sense of an agreement with respect to the *totality* of the transactions between plaintiff and defendant, *i.e.*, a final settlement between them. Defendant denied that the parties had either expressly or impliedly struck a balance in their claims against each other and agreed upon $10,720.90 as the amount which defendant should pay to plaintiff in final settlement of all claims existing between them. It contended that defendant had repeatedly pressed its setoff upon plaintiff's sales manager who had promised an adjustment, and that this was a sufficient protest or denial of the account to prevent its becoming an account stated.

"An account stated may be defined, broadly, as an agreement between the parties to an account based upon prior transactions between them, with respect to the correctness of the separate items composing the account, and the balance, if any, in favor of the one or the other. The amount or balance so agreed upon constitutes a new and independent cause of action, superseding and merging the antecedent causes of action represented by the particular constituent items; it is a liquidated debt, as binding as if evidence by a note, bill or bond." 1 Am. Jur. 272, Accounts and Accounting, Section 16. An account stated operates as a bar to any subsequent accounting except upon a specific allegation of facts constituting fraud or mistake. *Costin v. Baxter,* 41 N.C. 197; *Morganton v. Millner,* 181 N.C. 364, 107 S.E. 209.

An account can only become an account stated by an admission of its correctness by the party charged, or by its receipt and failure to deny liability within a reasonable time. *Brooks v. White,* 187 N.C. 656, 122 S.E. 561; *Savage v. Currin,* 207 N.C. 222, 176 S.E. 569.

The following succinct statement of the law with reference to account stated appears in *Little v. Shores,* 220 N.C. 429, 17 S.E. 2d 503: "To constitute a stated account there must be a balance struck and agreed upon as correct after examination and adjustment of the account. However, express examination or assent need not be shown — it may be implied from the circumstances. * * * An account becomes stated and binding on both parties if after examination the party sought to be charged unqualifiedly approves of it and expresses his intention to pay it. * * * The same result obtains where one of the parties calculates the balance due and submits his statement of account to the other who expressly admits its correctness or acknowledges its receipt and promises to pay the balance shown to be due, * * * or makes a part payment and promises to pay the balance. * * * It is

accepted law in this jurisdiction that when an account is rendered and accepted, or when so rendered there is no protest or objection to its correctness within a reasonable time, such acceptance or failure to so object creates a new contract to pay the amount due."

Where parties, who have had business dealings resulting in claims against each other, consider the claims in their entirety and have a complete accounting of all transactions between them, agreeing upon a final balance in favor of one or the other, such an agreement is certainly an account stated. It has also been called "a burnt-book settlement of all matters and things in controversy." However, an account stated need not cover all the dealings or all the claims between the parties; it may include certain items and leave others open for future adjustment. In that event it becomes an account stated only as to the items admitted to be correct. Anno. 175 A.L.R. 248.

An account stated extends only to those transactions contemplated by the parties. "In the last analysis, an account stated is nothing more than an agreement between the parties as to the items considered." 1 Am. Jur. 2d 397. In an action on an account stated, the party against whom the balance is claimed may set off against it any balance which he claims from items not included in the settlement. 1 Am. Jur. 2d 415.

"Where there is no attempt to dispute or question the items of an account, there is very little difference between an account and an account stated. Neither is it inconsistent to sustain a claim upon crosspetition as a counterclaim where its items are independent of the adjustment contained in the account stated." *Reed v. Thomas,* 134 Kan. 849, 8 Pac. 2d 379, 84 A.L.R. 110.

In this case the trial judge instructed the jury to answer the first issue YES if it found that the defendant was indebted to the plaintiff "in the sum of $10,720.80, either from account stated or the balance due upon open account." In explaining what constituted an account stated the judge told the jury that when an account is rendered "and there is no protest or objection to its correctness within a reasonable time, such failure to object creates a new contract or obligation to pay the amount due." He then gave the jury the following instruction:

> "Now, with respect, gentlemen, to the obligation upon the debtor to reject or deny an account stated, it must be done within a reasonable time. (And I instruct you that under the evidence in this case there was no evidence of a rejection of the account within a reasonable time, referring solely to the time limit.)"

That portion of the charge in parenthesis constitutes defendant's assignment of error No. 93, and it is the only portion of the charge on the first issue to which it excepts. The exception must be sustained.

Nowhere in his charge on the first issue did the judge instruct the jury as to the defendant's theory of the case. The vice in the challenged instruction is that it accepted plaintiff's theory that its monthly statement had become an account stated with respect to the totality of all transactions between the parties, and it completely ignored the negotiations which defendant's evidence tended to show were going on at the quarry in October between plaintiff's sales manager and defendant's engineer with reference to the defendant's protest that the aggregate being furnished did not meet specifications. Throughout this transaction, both the plaintiff and the defendant seem to have operated on two separate levels. According to the defendant's evidence, while the plaintiff's accounting department was sending out invoices and bills to the defendant and the defendant's bookkeepers were entering the charges and carrying them forward on its ledgers, the defendant's engineer and superintendent on the job were complaining to the plaintiff's sales manager and quarry superintendent that the aggregate was upsetting the formula and increasing costs, and the sales manager was promising "an adjustment" when the job was complete. Plaintiff's evidence is silent about this; the sales manager did not testify.

Plaintiff's invoices were prepared in Durham from daily reports which the quarry manager mailed in. The mail clerk turned the reports over to the price clerk who turned them over to the billing clerk who made out the invoices and sent them to the statistical clerk who mailed them to the defendant. Plaintiff's auditor never saw them unless some discrepancy developed or a customer protested. He knew nothing of the complaint which resulted in the sales manager, Mr. Champion, giving defendant an adjustment of $838.18 on September 21, 1957. This matter first came to his attention when the credit was entered on the plaintiff's books. Under these circumstances, the fact that defendant's treasurer made no protest to plaintiff's auditor did not justify a charge that there was no evidence of a rejection of the account within a reasonable time.

Furthermore, "What is a reasonable time within which objection must be made to an account rendered in order to preclude a presumption of acquiescence therein will depend upon the circumstances, among which may be enumerated the nature of the transaction, the relation of the parties, their distance from each other and the means of communication between them, their business capacity, their intelligence or want of intelligence and the usual course of their business." 1 Am. Jur., Accounts and Accounting, Section 28. Ordinarily what is a reasonable time is a question for the jury. Certainly if there is any conflict in the evidence, or if adverse inferences may be reasonably drawn from it, it is for the jury. Anno. 27 L.R.A. 825; 29 L.R.A. (N.S.) 341.

On this record it is doubtful that the challenged instruction affected the jury's answer to the first issue, and ordinarily an error in the charge on one issue is not presumed to have influenced the jury's answer to another issue. *Fleming v. Drye,* 253 N.C. 545, 117 S.E. 2d 416. However, error relating to one issue may not be disregarded when it is probable that it affected the answer to another. N. C. Index, Appeal and Error, Section 45. In this case, when the judge told the jury in his charge on the first issue that an account rendered would become an account stated if it were not rejected within a reasonable time and then stated that there was no evidence of a rejection within a reasonable time, it is apparent that this erroneous statement could have influenced the jury's consideration of the third issue. The third issue posed the question whether the aggregate failed to meet the required specifications. When it came to consider this issue, having been previously told by the judge that there was no evidence of any rejection of the account within a reasonable time, the jury may have concluded that there had been no breach of specifications because there had been no protest. In any event, the challenged portion of the charge amounted to an instruction to the jury to disregard the evidence of the protests by defendant's chairman and general manager and their negotiations with plaintiff's sales manager with reference to the aggregate being "out of specification." This was prejudicial error. G.S. 1-180.

Although the judge told the jury to answer the first issue YES if it found that defendant owed plaintiff $10,720.80, *either upon open account or an account stated,* when he came to the fourth issue, "Is the defendant estopped from making any claim by reason of an 'account stated'?", he charged the jury that if it had answered the first issue YES it would answer the fourth issue YES. This amounted to an instruction that a finding that defendant owed plaintiff the account eliminated any setoff. The jury did not answer the fourth issue, but this interrelation points up the fact that the effect of this erroneous charge could not be confined to the first issue.

Since there must be a new trial, a detailed consideration of the other assignments of error is not required as they may not arise again.

However, we deem it appropriate to point out that this record presents a somewhat anomalous situation. Plaintiff alleged in its reply that the written contract had been altered by a subsequent parol agreement, but offered no evidence to prove the allegation. Defendant alleged no change in the written contract but offered evidence tending to show modification of it. If so advised, defendant may consider the desirability of moving in the Superior Court for permission to amend its pleadings to conform to its evidence. What issues will arise upon

the evidence in the next trial cannot now be predicted. However, upon this record, no question of damages arises for plaintiff's alleged delay in delivering aggregate. The contract provided that if plaintiff was not able to furnish the aggregate the defendant would secure it elsewhere and plaintiff would be liable for any difference in defendant's costs. The Chairman of the Board of Dickerson, Inc. so testified. Thus, it is clear that damages for delay were not within the contemplation of the parties when the contract was made. *Troitino v. Goodman*, 225 N.C. 406, 35 S.E. 2d 277. There was no evidence that this provision of the written contract was ever altered, and the plaintiff, in fact, did furnish all the aggregate required for the project.

For the reasons stated herein there must be a new trial.

New trial.