JIMMY BERNARD GREEN, BY HIS GUARDIAN AD LITEM, BARBARA ANN GREEN, AND JAMES VERNON GREEN AND WIFE, BARBARA ANN GREEN v. A. KELLY MANESS, JR.

No. 8318SC951

(Filed 3 July 1984)

**1. Trial § 3.2— medical malpractice action—motion for continuance improperly denied**

   The trial judge erred in denying plaintiffs' motion for a continuance in a medical malpractice action when defendant brought forth a new expert witness with a new defense theory virtually on the eve of trial. While defendant at least arguably acted in good faith, it did not remedy the substantial probability of unfair surprise and prejudice to plaintiffs in that the medical expert's testimony was highly probative on the causation issue, and the full impact of his testimony was not revealed until the trial was well underway. G.S. 1A-1, Rule 26(e)(1) and G.S. 1A-1, Rule 37.

Green v. Maness

**2. Physicians, Surgeons and Allied Professions § 20.2— separate issues on negligence and causation—no abuse of discretion**

It is permissible to submit separate issues on negligence and causation, in the exercise of the trial court's discretion, provided the jury is adequately instructed on the issues submitted.

**3. Evidence § 14— physician-patient privilege—waiver**

A trial court may override the physician-patient privilege and compel disclosure "if in his opinion [disclosure] is necessary to a proper administration of justice," and when a patient voluntarily testifies in detail about his injuries and his medical treatment, he waives the privilege, and the adverse party may examine the physician. G.S. 8-53.

Judge PHILLIPS concurring.

APPEAL by plaintiffs from *Hobgood, Hamilton H., Judge.* Judgment entered 25 June 1982 in Superior Court, GUILFORD County. Heard in the Court of Appeals 2 April 1984.

Plaintiffs brought this medical malpractice action against defendant obstetrician seeking damages for permanent and severe brain damage suffered by the minor plaintiff, allegedly as a result of defendant's negligent acts or omissions during delivery. They alleged that the following acts or omissions by defendant caused the minor plaintiff, who was born with cerebral palsy after a long and complicated delivery which defendant attended, to be deprived of oxygen during birth, thereby damaging his brain: (1) failure to accomplish delivery until forty-one minutes after the birth of the minor plaintiff's twin brother, (2) premature rupture of the minor plaintiff's amniotic sac, (3) improper use of the anesthetic drug cyclopropane, (4) improper use of the drug pitocin for stimulating contractions in the mother, (5) failure to monitor the fetal heart rate, (6) negligent examination of the mother, and (7) inadequate preparation for the delivery.

Testimony from plaintiffs' expert medical witnesses tended to support these allegations of defendant's negligence. Defendant's experts testified, however, that defendant had conformed to acceptable standards of medical care for that community at that time, and that the minor plaintiff's cerebral palsy was caused by a congenital defect instead of by oxygen deprivation during birth.

The trial court submitted separate issues on negligence, causation, and damages. The jury found defendant not negligent and therefore did not address the other issues.

Plaintiffs appeal.

*Clark & Wharton, by David M. Clark and John R. Erwin, for plaintiff appellants.*

*Tuggle, Duggins, Meschan & Elrod, by Joseph E. Elrod, III, and J. Reed Johnston, Jr., for defendant appellee.*

WHICHARD, Judge.

[1] Plaintiffs contend they suffered prejudicial surprise when defendant brought forth a new expert witness with a new defense theory virtually on the eve of trial, and that the court thus erred in denying their motion for a continuance to enable them to prepare to meet the resultant changed conditions. While (1) a motion to continue ordinarily is addressed to the sound discretion of the trial judge, and (2) continuances are not favored, and parties seeking them have the burden of showing sufficient grounds therefor, the chief consideration to be weighed in passing on the motion is whether its grant or denial will be in furtherance of substantial justice. *Shankle v. Shankle,* 289 N.C. 473, 482-83, 223 S.E. 2d 380, 386 (1976). A party who is unprepared for trial as a result of changed conditions may be entitled to a continuance as a matter of right. *See Watson v. Black Mountain Railway Co.,* 164 N.C. 176, 181, 80 S.E. 175, 177 (1913); *Dobson v. Southern Railway Co.,* 129 N.C. 289, 291, 40 S.E. 42, 43 (1901). Our Supreme Court has found error in the denial of motions for continuance where a party, for reasons not of its own making, was unprepared for trial. It has held such parties entitled to a continuance, and has awarded new trials in such situations when "the ends of justice" required it. *Shankle, supra; Smith v. Bryant,* 264 N.C. 208, 141 S.E. 2d 303 (1965). Because we find substantial probability of prejudice to plaintiffs here from denial of their motion for continuance, we hold that, as in *Shankle,* "the ends of justice" require a new trial.

The facts pertinent to decision on the continuance motion are as follows:

The minor plaintiff's mother gave birth to twin sons on 3 August 1974. The first-born was the product of an uneventful delivery and is a normal child. The birth of the second-born, the minor plaintiff, did not occur until forty-one minutes after the

birth of the first-born. The minor plaintiff did not breathe spontaneously for about thirty minutes after birth. A complete medical examination three days later showed that he suffered from neurological deficit, or brain damage.

The physician in charge of the examination recorded the impression that the minor plaintiff had undergone "severe intrauterine asphyxia," *i.e.*, a severe lack of oxygen during the birth process. At the time of trial the minor plaintiff, then eight years of age, suffered from cerebral palsy and was significantly handicapped.

Jury selection for trial of this case was set for 3-4 June 1982, with presentation of evidence to commence on 7 June 1982. Shortly before those dates, on 14 May 1982, defendant, while flying to a medical school meeting in Philadelphia, coincidentally met Dr. Allen Roses, Professor and Chief of the Division of Neurology at Duke University Medical Center. Defendant and Dr. Roses discussed this case, and Dr. Roses offered to review the medical records pertinent to it. Counsel for defendant delivered these records to Dr. Roses on 19 May 1982. On 25 May 1982 Dr. Roses advised defense counsel that in his opinion the minor plaintiff's palsy could have been caused by a preexisting condition or congenital anomalies. None of defendant's anticipated witnesses had so opined previously. Defendant himself had mentioned in his deposition only the "possibility" of an intracranial defect which would take an examination of the child and the testimony of a neonatologist or neurologist to establish. During the pretrial period, defendant made no request for examination of the child and listed no neonatologist or neurologist as a witness.

On 25 May 1982, the day he was informed of Dr. Roses' opinion, defense counsel filed a supplemental response to plaintiffs' interrogatories indicating Dr. Roses' opinion and the possibility that he would be called as an expert witness for defendant. Plaintiffs made arrangements to depose Dr. Roses as soon as possible. Meanwhile, on 1 June 1982, all parties signed the order on final pretrial conference, which had been revised to include Dr. Roses as a potential defense witness.

On the night of 1 June 1982 plaintiffs deposed Dr. Roses. The witness stated that the medical records showed that two brain taps had been performed on the minor plaintiff shortly after his

birth. The taps revealed subarachnoid fluid in the subdural region. Dr. Robert G. Dillard, a treating physician and defense witness, and other experts, had attributed no significance to the results of the taps when they were performed. Dr. Roses testified, however, that the fluid drawn in the brain taps was indicative of a congenital deformity—a view subsequently adopted by Dr. Dillard at trial. Counsel for plaintiffs felt that he was "faced with the position of educating [him]self on a new area of medicine" due to Dr. Roses' introduction of "an entirely new medical concept" immediately before the trial began.

As noted, jury selection was slated to begin on 3 June 1982, only a little over a day after plaintiffs took Dr. Roses' deposition. Plaintiffs moved for a continuance, or in the alternative to exclude Dr. Roses' testimony. They argued that the late disclosure of defendant's new theory of congenital deformity, which would have eliminated negligence in the delivery process as the cause of the minor plaintiff's cerebral palsy, had left them unprepared. They had not even received the transcript of Dr. Roses' deposition at the time the motion for a continuance was made, and their experts thus had not had an opportunity to evaluate his opinion.

Counsel for plaintiffs argued in support of the motion for continuance: "In order to represent the child, I've got to be prepared on the testimony." He further noted that plaintiffs' expert, Dr. William McLean, with whom they hoped to rebut Dr. Roses' opinion, was scheduled to be out of the country after 17 June 1982. Since it was anticipated that the trial would last beyond that date, plaintiffs thus would lose their chance to rebut the damaging testimony of Dr. Roses unless they called him as their witness. The denial of a continuance ultimately forced plaintiffs to choose that tactic, which allowed Dr. Roses to testify both before and after the plaintiffs' expert neurologist.

In moving for a continuance plaintiffs also expressed concern that defendant would enlarge the problem by calling other experts at trial to testify on the issue raised by Dr. Roses. This concern proved well-founded, as Dr. Dillard changed his opinion on the brain tap results to echo Dr. Roses' theory; and two other witnesses were called unexpectedly to elaborate on other aspects of Dr. Roses' testimony.

The problem was further enlarged in Dr. Roses' actual trial testimony, when he propounded yet another theory as to why defendant's acts probably did not cause the minor plaintiff's cerebral palsy. He testified that the minor plaintiff had a form of cerebral palsy known as ataxia, which he stated was caused in 90% of the cases by a congenital defect. Defendant, as well as plaintiffs, professed surprise at this new diagnosis expressed for the first time during trial. Defense counsel successfully used his surprise at this unexpected favorable testimony as a basis for calling two more expert witnesses, not listed on the pretrial order, to support Dr. Roses' diagnosis of ataxic cerebral palsy.

In opposition to the motion for continuance, defendant observed that his experts had denied causation from the beginning; and that the hospital discharge records stated that the minor plaintiff may have suffered from a congenital defect as well as oxygen deprivation. He pointed out that the late disclosure of Dr. Roses and his opinion on causation was due to chance, not to any concealment or bad faith surprise tactics on defendant's part. Citing *Shankle, supra*, he argued that continuances are not favored and lie within the sound discretion of the trial court. He maintained that plaintiffs should have anticipated the type of testimony presented by Dr. Roses, since causation is an obvious issue in a negligence action.

At one point during argument on the motion the court stated: "Now, of course, I take a rather dim view of [defense counsel's] position on bringing in a doctor this late in the trial procedure, because I realize there are certain rules." Ultimately, however, the court stated: "I came up here in order to try the case so I'm planning to try it." It then denied the motion to continue. Subsequently, after reading Dr. Roses' deposition, it denied plaintiffs' alternative motion to exclude Dr. Roses' testimony.

We find the decision allowing Dr. Roses to testify proper. The search for truth and "the ends of justice" generally require that a key expert medical witness be permitted to testify in a medical malpractice action. *See Shepherd v. Oliver*, 57 N.C. App. 188, 190, 290 S.E. 2d 761, 763, *disc. rev. denied*, 306 N.C. 387, 294 S.E. 2d 212 (1982). In *Shepherd*, however, this Court recognized the possibility of unfair surprise when one party calls an expert witness at trial with little advance notice to the other. It ob-

served that the trial court could solve this problem by "allow[ing] the [adverse party] an opportunity to prepare for this witness by granting a continuance or an opportunity to take a deposition." *Id.*

While plaintiffs here were allowed to depose Dr. Roses, the particular circumstances nevertheless resulted in unfair surprise and denied plaintiffs adequate preparation for trial. Dr. Roses' deposition and defendant's supplemental response to interrogatories, which were vague and late in the discovery process, did not sufficiently narrow the causation issue and did not present it sufficiently soon to enable plaintiffs to prepare cross-examination and rebuttal effectively. The unavailability prior to trial of a transcript of Dr. Roses' deposition testimony considerably diminished its utility for trial preparation. As noted, even defendant expressed surprise at the manner in which the causation issue developed during trial.

In *Shankle* our Supreme Court stated, in awarding a new trial on the ground of error in the denial of a continuance: "It is patent that neither side was prepared for the trial . . .; that the evidence was not developed, and the issues which will determine the merits of the controversy were never defined." *Shankle, supra,* 289 N.C. at 486, 223 S.E. 2d at 388. Here, as in *Shankle,* neither side was prepared on the causation issue prior to trial, and defendant's basis for attacking causation was not defined until after the trial commenced. Plaintiffs could not obtain adequate expert analysis of Dr. Roses' deposition testimony until after trial commenced, and even then were handicapped initially by the absence of a transcript of his testimony. The deposition, which was hastily taken near the eve of trial, did not disclose a crucial ground for Dr. Roses' opinion on causation, *viz,* his diagnosis of ataxia. Plaintiffs thus were placed in the awkward position of having to obtain a computerized tomography scan of the minor plaintiff after commencement of trial, and of presenting films of the scan to Dr. Roses for the first time during trial. In these circumstances it is evident that the deposition route suggested by *Shepherd, supra,* was inadequate to enable plaintiffs to prepare for Dr. Roses' crucial testimony at trial, and that only a continuance would have done so.

In a recent opinion this Court has addressed the problem of late-breaking discovery in complex medical malpractice actions.

*See Willoughby v. Wilkins*, 65 N.C. App. 626, 310 S.E. 2d 90 (1983), *disc. rev. denied*, 310 N.C. 631, 315 S.E. 2d 698 (1984). There, as here, the trial court did not have the benefit of North Carolina case law delineating the period during which new defense witnesses or theories of the case could be introduced. *See* 65 N.C. App. at 640, 310 S.E. 2d at 99. That decision awarded a new trial because the case had been set peremptorily for trial while discovery was incomplete, and the trial court thereafter had denied plaintiff's motion to compel discovery. *Id.* at 642, 310 S.E. 2d at 100. The result was that plaintiff was unable effectively to cross examine defendants' expert medical witnesses.

The same result obtained here, not from denial of a motion to compel discovery, but from denial of plaintiffs' motion for continuance. The spirit of *Willoughby*, if not the letter, thus requires that plaintiffs here, like the plaintiff there, be awarded a new trial, to afford them the same opportunity for adequate trial preparation that was afforded the plaintiff there.

G.S. 1A-1, Rule 26(e) (1) provides:

A party is under a duty seasonably to supplement his response [to a discovery request] with respect to any question directly addressed to ... (ii) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

Our courts and the federal courts have held consistently that the purpose and intent of this rule is to prevent a party who has discoverable information from making evasive, incomplete, or untimely responses to requests for discovery. *See* cases cited in *Willoughby, supra*, 65 N.C. App. at 641, 310 S.E. 2d at 99-100. In addition to its inherent authority to regulate trial proceedings, the trial court has express authority under G.S. 1A-1, Rule 37, to impose sanctions on a party who balks at discovery requests.

Nothing in this record indicates that defendant failed to respond with due diligence and in good faith to discovery requests regarding its expert witnesses. Defense counsel apparently notified plaintiffs' counsel immediately once he knew he intended to call Dr. Roses as a witness. Hence, no occasion for imposition of G.S. 1A-1, Rule 37 sanctions was presented.

Defendant's supplemental response to interrogatories was not rendered "seasonable" within the meaning and intent of G.S. 1A-1, Rule 26(e)(1), however, by the mere fact that there was no occasion for imposition of sanctions. In *Willoughby* this Court defined "seasonable" in terms of the ability of the receiving party to prepare for trial, not in terms of whether the party providing supplemental information acted in good faith. It stated:

> While we decline to state a mathematical formula to determine what is "seasonable," we find that supplemental answers to interrogatories are not seasonable when the answers are made so close to the time of trial that the party seeking discovery thereby is prevented from preparing adequately for trial, *even with the exercise of due diligence.*

*Willoughby, supra,* 65 N.C. App. at 641, 310 S.E. 2d at 100 (emphasis supplied). Because it focuses on adequate preparation and promotes full knowledge of the facts and issues before trial begins, this definition of "seasonable" accords with the philosophy of the Rules of Civil Procedure. *See Hickman v. Taylor,* 329 U.S. 495, 500-01, 67 S.Ct. 385, 388-89, 91 L.Ed. 451, 457 (1947); *Carpenter v. Cooke,* 58 N.C. App. 381, 384, 293 S.E. 2d 630, 632, *cert. denied and appeal dismissed,* 306 N.C. 740, 295 S.E. 2d 758 (1982); 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2001 (1970). A definition similar to that in *Willoughby* was proposed over twelve years earlier in the following statement: "The term 'seasonably' is difficult to understand. A test may be that the supplementation is made in time for the other party to take whatever action is necessary in preparation for trial." Clough, Rx for Defense — Aggressive Use of the Amended Federal Rules of Civil Procedure, 38 Ins. Counsel J. 354, 355 (1971).

In *Willoughby* the plaintiff learned of a new expert defense witness ten days before trial and deposed him one day before trial. *Willoughby, supra,* 65 N.C. App. at 642, 310 S.E. 2d at 100. Here plaintiffs learned of a new expert defense witness, with a significant new theory of causation, nine days before jury selection commenced; and they deposed him a little over one day before jury selection commenced. In both cases the depositions came too late to enable plaintiffs to prepare adequately for cross-examination and development of rebuttal evidence.

In sum, defendant's supplemental response to plaintiffs' interrogatories, and plaintiffs' deposing of the new expert defense witness disclosed thereby, came too close to trial time to allow plaintiffs adequate time to prepare a response to the newly disclosed information. The information involved a complex medical issue which required lengthy analysis and consultation with experts. The supplemental response was inadequate in content. Plaintiffs' interrogatories had requested "[t]he substance of the facts and opinions to which each . . . expert is expected to testify and a summary of the grounds for each opinion." Defendant's response stated, in pertinent part: "Dr. Roses is of the opinion that [the minor plaintiff's] condition could be the result of a preexisting condition and/or congenital anomalies that were in existence prior to the time of his delivery . . . ." This response failed to notify plaintiffs of the bases for the opinion, such as the abnormal fluid from the subdural tap, and the likelihood of ataxic cerebral palsy resulting from congenital defects.

While defendant at least arguably acted in good faith, this does not remedy the substantial probability of unfair surprise and prejudice to plaintiffs. Dr. Roses' testimony was highly probative on the causation issue, and the full impact of his testimony was not revealed until the trial was well underway. While the jury found no negligence, and thus did not reach the separate causation issue, the evidence regarding negligence and causation was inextricably intertwined. Dr. Roses testified that the birth delay was the result of the minor plaintiff's condition, not the cause of it. Both Dr. Roses and defendant based their opinions as to absence of negligence in part on the theory that the minor plaintiff's condition reflected a congenital defect, which occurred before delivery, and therefore could not have been the product of negligence by defendant. The issues of negligence and causation thus were so closely interwoven in the evidence that the probability that Dr. Roses' causation testimony affected the jury's verdict on negligence is substantial. While "[t]he jury's answer to one issue which determines the rights of a party may render exceptions concerning other issues moot [,] . . . 'error relating to one issue may not be disregarded when it is probable that it affected the answer to another.'" *Cockrell v. Cromartie Transport Co.*, 295 N.C. 444, 452, 245 S.E. 2d 497, 502 (1978) (quoting *Nello L. Teer Co. v. Dickerson, Inc.*, 257 N.C. 522, 533, 126 S.E. 2d 500, 508 (1962) ).

In awarding a new trial in *Willoughby, supra,* 65 N.C. App. at 642, 310 S.E. 2d at 100, this Court stated: "We are unable to say that plaintiff here was not prejudiced by an inability to adequately prepare for cross examination of defendants' expert witnesses." We are equally unable to say that plaintiffs here were not similarly prejudiced. We thus hold that both consistency with *Willoughby* and "the ends of justice," *Shankle, supra,* require a new trial for which plaintiffs have adequate opportunity to prepare.

Two of the remaining issues argued in plaintiffs' brief may well recur upon retrial. We thus offer the following observations regarding them:

[2]   With regard to the first, *viz,* the contention that the court erred in submitting separate issues on negligence and causation, "[t]he number, form and phraseology of the issues lie within the sound discretion of the trial court, and the issues will not be held for error if they are sufficiently comprehensive to resolve all factual controversies and to enable the court to render judgment fully determining the cause." *Chalmers v. Womack,* 269 N.C. 433, 435-36, 152 S.E. 2d 505, 507 (1967). Without judging the wisdom of submitting separate issues on negligence and causation, we believe such to be permissible, in the exercise of the trial court's discretion, provided the jury is adequately instructed on the issues submitted.

[3]   With regard to the second, *viz,* the contention that the court erred "in violating the physician-patient privilege and other established rights of the minor plaintiff" by allowing certain physicians who had examined or treated the minor plaintiff to testify for defendant, we note that the trial court may override the physician-patient privilege and compel disclosure "if in his opinion [disclosure] is necessary to a proper administration of justice." G.S. 8-53. We note further that the physician-patient privilege may be waived. "That this purely statutory privilege may be waived is undisputed." Note, 16 N.C. L. Rev. 53, 54 (1937), *quoted in Capps v. Lynch,* 253 N.C. 18, 22, 116 S.E. 2d 137, 141 (1960). The waiver may be express or implied. *Capps, supra.* When a patient voluntarily testifies in detail about his injuries and his medical treatment, he waives the privilege, and the adverse party may examine the physician. *Id.* at 23, 116 S.E. 2d at 141-42. One prominent commentator has stated that "the *bringing of an action*

in which an essential part of the issue is the existence of physical ailment should be a *waiver* of the privilege for all communications concerning that ailment." 8 J. Wigmore, *Evidence* § 2389 (McNaughton rev. 1961); *see also Awtry v. United States*, 27 F. R.D. 399 (S.D.N.Y. 1961); Annot., 21 A.L.R. 3d 912 (1968 & Supp. 1983).

"The question of waiver is [, however,] to be determined largely by the facts and circumstances of the particular case on trial." *Capps, supra*, 253 N.C. at 23, 116 S.E. 2d at 141. If the issue presented arises upon retrial, the court should resolve it by application of the foregoing principles to the particular facts and circumstances as then presented.

The other issues presented are unlikely to recur upon retrial, and we thus do not consider them.

New trial.

Chief Judge VAUGHN and Judge PHILLIPS concur.

Judge PHILLIPS concurring.

The erroneous refusal to delay the trial and allow plaintiffs a fair opportunity to deal with the complex new medical theory that the court permitted defendant to present in evidence, though not mentioned during long and extensive discovery, was greatly enhanced and compounded by other errors that it led to. These included permitting defendant, because of his "surprise" at the depth and ramifications of Dr. Roses' testimony, to call two other unlisted experts to the stand, refusing to let an unlisted expert for plaintiffs testify that in his opinion the child was not congenitally deficient, but was injured during birth, and in refusing to permit plaintiffs to question certain witnesses of the defendant as the adverse hostile witnesses that they clearly were. Only the latter error will be discussed. Though permitting Dr. Roses to testify as to his congenital deficiency theory had the practical effect of virtually requiring plaintiffs to call him and Dr. Dillard, who had come to support the theory though of a different opinion earlier, to the stand near the beginning of the trial, the court refused to permit plaintiffs to question them as hostile witnesses. Under the provisions of Rule 43(b), N.C. Rules of Civil Procedure, a party has the legal right to interrogate hostile witnesses under

the same conditions as though put on the stand by the opposing party. While determining whether a witness is hostile or not is normally within the trial court's discretion, the situation is otherwise when the evidence indisputably shows, as it did here, that the witnesses were hostile to plaintiffs. *Goodson v. Goodson*, 32 N.C. App. 76, 231 S.E. 2d 178 (1977).

The evidence shows without dispute that: Dr. Roses is an old college friend of defendant, and though a busy medical practitioner at the Duke Medical Center, he rearranged his affairs on very short notice so as to be of aid in connection with defendant's trial when and where needed; during that brief time he conferred with defense counsel, defendant, and his other expert witnesses, prepared for and gave his deposition at night, and was in Greensboro for the trial. Dr. Dillard, a professional neighbor and colleague of defendant's, was engaged by defense counsel to school and advise him about the medical problems in the case, the clear purpose of which was to defeat plaintiffs' case and exonerate the defendant. His situation was further compounded by the facts that: Though he had treated the infant plaintiff and thus owed him the same confidentiality that all doctors owe their patients, he, nevertheless, without being authorized to do so by either the plaintiffs or the court, discussed plaintiffs' claim with defense counsel and other expert witnesses, assisted in preparing the medical defense, permitted defense counsel to list him as a witness for defendant, and the opinion expressed immediately after the child's birth as to the cause of its condition was changed and he became a supporter of the belatedly developed congenital anomaly theory. Furthermore, the record shows that defendant's counsel even had the temerity during the course of discovery to formally notify plaintiffs' counsel by letter not to confer with his witness, Dr. Dillard, and that if he attempted to do so he would be reported to the grievance committee of the North Carolina State Bar; a course that the judge handling discovery ruled was a wrongful attempt on defendant's part to "immunize" Dr. Dillard from the plaintiffs. And, of course, both witnesses are highly trained, educated, experienced doctors that were obviously capable of taking care of themselves as witnesses in their field of practice, which is all they were to be questioned about. Under the circumstances, that plaintiffs could not even ask leading questions of these witnesses, while the defendant did, and could neither im-

peach nor contradict the witnesses, as Rule 43(b) authorized, would warrant a new trial even in the absence of other errors, in my opinion. The case largely hinged on their testimony, which would probably have sounded materially different if it had been presented in the form plaintiffs were entitled to.