PAUL SWINK, Individually and as ADMINISTRATOR OF THE ESTATE OF MARGARET SWINK, Plaintiff v. RICHARD A. WEINTRAUB, M.D. and THE SOUTHEASTERN HEART AND VASCULAR CENTER, P.A., Defendants

No. COA07-960

No. COA07-1088

(Filed 3 February 2009)

**1. Medical Malpractice— expert testimony—knowledge of community standard of care—not applicable to reasonable care and best judgment requirements**

The community standard of care does not apply to the second and third prongs of the common law duties set out in *Hunt v. Bradshaw*, 242 N.C. 517, reasonable care and diligence, and use of best judgment in treating the patient. The trial court in this wrongful death action arising from the replacement of a pacemaker did not err by failing to require testimony from plaintiff's experts about their knowledge of the community standard of care when giving their opinion of the doctor's exercise of reasonable care and diligence and the doctor's use of his best judgment. The argument that N.C.G.S. § 90-21.12 effectively supplanted the common law was addressed in *Wall v. Stout*, 310 N.C. 184.

**2. Discovery— deposition and trial testimony—no substantial variation—inability to prepare for trial—not shown**

The trial court did not abuse its discretion in a wrongful death case arising from a pacemaker replacement by failing to exclude portions of the testimony of plaintiff's experts where the experts did not use the terms "best judgment" and "reasonable care and diligence" during discovery. The deposition and trial testimony did not vary substantially, and defendants did not explain why their knowledge of the witnesses' criticisms of defendants was inadequate for them to prepare for trial.

**3. Discovery— allegedly new opinions at trial—similar deposition testimony—new medical theories not presented**

The trial court did not abuse its discretion in a wrongful death action arising from a pacemaker replacement by allowing plaintiff's experts to testify about previously undisclosed opinions regarding causation and other subjects. Plaintiff accurately pointed to portions of the witnesses' depositions in which similar testimony appeared or identified parallel testimony from other

witnesses. Defendants did not point to any entirely new medical theory presented at trial or specifically explain how they could not prepare for the testimony presented at trial.

**4. Medical Malpractice— expert witness—personal opinion and practice**

The trial court did not err in a wrongful death proceeding arising from the replacement of a pacemaker by admitting testimony from one of plaintiff's medical experts about his personal preferences and practices in conducting informed consent discussions. Although defendants argue that this was not evidence of the standard of care and should have been excluded as irrelevant, such evidence may be relevant for other purposes.

**5. Medical Malpractice— expert's personal preferences—requested limiting instruction—not given**

There was no error in not giving the requested limiting instruction on testimony regarding a medical expert's personal preferences and practices in a wrongful death case arising from a pacemaker replacement. The language in the requested instruction does not precisely state the applicable law, and defendant did not explain a way in which the jury was misled by the omission of the instruction.

**6. Medical Malpractice— concerns from prior surgery—admissible**

The trial court did not err in a wrongful death action arising from a pacemaker replacement by admitting testimony from the decedent's husband about his wife's statements about complications after a prior surgery. Defendants did not show how they were prejudiced by testimony about a procedure that was not the basis for this lawsuit; moreover, the testimony simply explained the concern the decedent and her husband had about this procedure and duplicated other testimony that was not challenged.

**7. Evidence— hearsay—doctor's statement repeated—admission of party opponent**

The trial court did not err in a wrongful death action arising from a pacemaker replacement by admitting testimony from the decedent's spouse that a doctor said in a deposition that he had called for a surgeon to come to the cath lab and that there had been a delay. The doctor was an employee of defendant hospital at the time of the deposition and his statements constituted admissions of a party-opponent.

**8. Appeal and Error— preservation of issues—objection overruled, then sustained**

There was no issue for appellate review in a wrongful death action arising from a pacemaker replacement where the trial court overruled an objection to testimony from the decedent's spouse about what a doctor said concerning an autopsy, but sustained a renewed objection.

**9. Evidence— hearsay—statements in medical procedure room—basis for witness's action**

The trial court did not err in a wrongful death action arising from a pacemaker replacement by admitting a videotaped deposition of a lab technician who was present during the procedure where the witness reported what another lab technician said or observed during the procedure. The statements were admissible to show why the witness acted as she did.

**10. Evidence— speculation—admission harmless—other admissible testimony**

The admission of testimony from a lab technician in a wrongful death action arising from a pacemaker replacement about when the doctor realized that the decedent's heart had stopped was harmless because it was essentially identical to the testimony of two doctors, including the doctor who was the subject of the witness's testimony.

**11. Witnesses— expert—no objection to qualifications when tendered**

There was no error in a wrongful death action arising from the replacement of a pacemaker in admitting expert testimony from plaintiff's economist about damages. Defendants did not object to the witness's qualifications when he was tendered as a witness, and did not explain any way in which he was not qualified to testify about the value of lost income or services.

**12. Wrongful Death— special instruction—informed consent—absence of written request**

The trial court did not abuse its discretion in a wrongful death action arising from a pacemaker replacement by not giving a special jury instruction on informed consent where defendants did not submit a written proposed instruction, and the evidence was at best equivocal as to whether the decedent had signed a consent form that covered the procedure in question.

**13. Medical Malpractice— instructions—plaintiff's contentions**

The trial court did not err in its jury instructions in a wrongful death case arising from the replacement of a pacemaker by repeating plaintiff's contentions of negligence following its instruction on each of the three theories for proving medical malpractice. Viewed in their entirety, the instructions were not overly favorable to plaintiff and the pattern instructions were not inherently inculpatory.

**14. Medical Malpractice— jury request—re-instruction—plaintiff's contentions**

The trial court did not abuse its discretion in a wrongful death action arising from a pacemaker replacement by re-instructing the jury on negligence when requested by the jury, reiterating the three methods of proving negligence and plaintiff's seven contentions. Defendants did not suggest that the trial court omit the factual contentions and did not adequately preserve the issue of re-instruction for appeal.

**15. Costs— jurisdiction—order following notice of appeal**

The trial court erred by taxing costs against defendants in a wrongful death action where the order on costs was entered after notice of appeal was filed. A reservation of the issue is not sufficient, and the order taxing costs was vacated as a matter of jurisdiction even though the underlying judgment was upheld. The better practice is for the trial court to defer entry of judgment until after ruling on attorney's fees and costs, so that there will be one appeal from one judgment.

Appeal by defendants from judgment entered 1 March 2007 and order entered 1 May 2007 by Judge Gary E. Trawick in Guilford County Superior Court. Heard in the Court of Appeals 3 March 2008.

*Comerford & Britt, LLP, by Kevin J. Williams, for plaintiff-appellee.*

*Wilson & Coffey, L.L.P., by G. Gray Wilson and J. Chad Bomar, for defendants-appellants.*

GEER, Judge.

This opinion addresses two appeals arising from the same wrongful death action brought by plaintiff Paul Swink individually and as administrator of the estate of his wife, Margaret Swink. Defendants

SWINK v. WEINTRAUB

[195 N.C. App. 133 (2009)]

Dr. Richard A. Weintraub and the Southeastern Heart and Vascular Center, P.A. ("Southeastern") appeal from (1) the trial court's judgment based on the jury's verdict finding them negligent in the death of Mrs. Swink (COA07-1088), and (2) the trial court's order taxing costs against defendants (COA07-960). The two appeals were previously consolidated for hearing and now are consolidated for decision.

Defendants' principal contention as to the trial is that the trial court erred in admitting opinion testimony from plaintiff's medical experts as to whether defendants exercised reasonable care and diligence and used their best judgment without requiring the experts to testify, as to those opinions, regarding the "same or similar community" standard of care set out in N.C. Gen. Stat. § 90-21.12 (2007). The Supreme Court has already determined in *Wall v. Stout*, 310 N.C. 184, 311 S.E.2d 571 (1984), that § 90-21.12 does not apply to the duty of reasonable care and diligence and the duty of best judgment. Only the Supreme Court may revisit *Wall*. Since we are unpersuaded by defendants' remaining arguments as to the trial, we hold that defendants received a trial free of prejudicial error.

With respect to the order taxing costs, however, we hold that the trial court lacked subject matter jurisdiction to enter the order as defendants had already appealed from the underlying judgment. We must, therefore, vacate that order and remand for entry of a new order.

Facts

On 9 June 2003, Mrs. Swink and her husband went to Dr. Weintraub, who was employed by Southeastern, to discuss replacement of her pacemaker that was approaching the end of its life span. During the visit, Dr. Weintraub informed the Swinks that one of the pacemaker's electrical leads was defective and also needed to be replaced.

Mrs. Swink had previously undergone surgery in 1994 for maintenance of her pacemaker. Dr. Weintraub performed the 1994 surgery, doing a procedure known as "lead extraction." During the surgery, Mrs. Swink suffered complications that required giving her cardiopulmonary resuscitation. As a result of the 1994 surgery, Mrs. Swink was scared about undergoing another lead extraction surgery in 2003.

In the 9 June 2003 consultation, Mr. Swink reminded Dr. Weintraub of the complications during the 1994 surgery and asked

that the non-functioning lead be left in place if possible. Dr. Weintraub's notes of the office visit stated that his plan was to extract the lead "if this can be done easily." Mr. Swink testified that, based on the office visit, he understood that there was no alternative to lead extraction, even though, in actuality, nonfunctioning leads can be left in place. Mr. Swink also testified that Dr. Weintraub did not discuss with them the risks of lead extraction. Mrs. Swink ultimately executed a form consenting to a procedure to receive a "permanent transvenous pacemaker," but did not sign any form expressly consenting to a lead extraction procedure.

The pacemaker replacement surgery was originally scheduled for 16 June 2003. On 11 June 2003, however, Mrs. Swink arrived at the hospital with total lead electrode failure and was taken to the cath lab for the permanent transvenous pacemaker procedure. While attempting to perform the lead extraction, Dr. Weintraub encountered considerable scar tissue surrounding the non-functioning ventricular lead. At approximately the same time that Dr. Weintraub discovered the scar tissue, Mrs. Swink's heart stopped beating, and she ceased breathing. Dr. Weintraub called a "code."

Mrs. Swink was suffering from pericardial bleeding, which is treated by inserting a syringe into the chest to withdraw the accumulating blood, a procedure known as "pericardioscentesis." An expert witness testified that pericardioscentesis needs to be performed quickly because brain death begins to occur in as little as four to six minutes. According to the operating room's event log, Dr. Weintraub did not perform the pericardioscentesis until 17:24—approximately 19 minutes after the code was announced at 17:05. Mr. Swink presented evidence at trial that, prior to the code, a pericardioscentesis kit was not in the room.

Several calls were made to obtain a surgeon, but a surgeon (Dr. Gerhardt) did not arrive until 18:03, almost an hour after the code. Mr. Swink presented evidence that Dr. Gerhardt and his partners were, however, "right down the hall." Although the surgeon was able to stabilize Mrs. Swink, she was already brain dead. She died on 13 June 2003 after her family decided to remove her from life support.

On 8 June 2005, Mr. Swink filed a wrongful death action against Dr. Weintraub, Southeastern, Moses H. Cone Memorial Hospital, Moses H. Cone Memorial Hospital Operating Corporation, and Moses Cone Medical Services, Inc., asserting claims of medical malpractice. Following a trial on the claims against Dr. Weintraub and South-

eastern,[1] the jury returned a verdict in Mr. Swink's favor, finding defendants Dr. Weintraub ·and Southeastern negligent and awarding damages in the amount of $1,047,732.20. The trial court entered judgment in accordance with the verdict on 1 March 2007. Defendants filed notice of appeal from that judgment on 20 March 2007.

On 22 March 2007, plaintiff moved to tax certain costs against defendants, requesting a total of $119,075.33. In an order entered 1 May 2007, the trial court granted plaintiff's motion, taxing defendants $72,709.97 in costs. Defendants appealed from that order on 29 May 2007.

I

**[1]** Defendants first argue that the trial court erred in admitting certain opinion testimony from Mr. Swink's expert witnesses without requiring them to testify, as to those opinions, regarding the "same or similar community" standard of care. We first observe that defendants have not, in their brief, specifically cited or quoted the testimony that they claim was erroneously admitted. Moreover, defendants have not attached the pertinent testimony in an appendix to the brief. The only place where defendants have identified which. testimony is at issue is in the assignments of error contained in the record on appeal. This approach is not adequate under the Rules of Appellate Procedure and renders more difficult the Court's review of the issue raised by defendants.

Rule 28(d)(1) specifies that "the appellant *must* reproduce as appendixes to its brief . . . those portions of the transcript of proceedings which must be reproduced verbatim in order to understand any question presented in the brief . . . ." (Emphasis added.) On the other hand, an appellant "is not required to reproduce an appendix to its brief with respect to an assignment of error . . . whenever the portion of the transcript necessary to understand a question presented in the brief is reproduced verbatim in the body of the brief . . . ." N.C.R. App. P. 28(d)(2).

This Court cannot review defendants' argument regarding the admissibility of certain portions of the expert testimony without specifically reviewing those portions of the transcript. Defendants were, therefore, required to either quote the testimony in the body of their brief or attach the pertinent testimony in an appendix to the

---

1. The Moses Cone defendants did not participate in that trial and are not parties to this appeal.

brief. Not only have defendants neglected to comply with Rule 28(d), they have also failed to address in this section of their brief any specifically identified testimony at all.

In any event, defendants do not dispute that Mr. Swink's expert witnesses were competent to testify as to the standards of care that existed in Greensboro, North Carolina, in June 2003 with respect to lead extraction procedures. Defendants instead complain that questions regarding whether Dr. Weintraub "used his best judgment or exercised reasonable care and diligence . . . were asked outside the context of a community standard and were opinions based on speculation as to the state of mind of Doctor Weintraub."

Defendants' argument hinges on their contention that *Hunt v. Bradshaw*, 242 N.C. 517, 522, 88 S.E.2d 762, 765 (1955), was superseded or altered by N.C. Gen. Stat. § 90-21.12. In *Hunt*, the Supreme Court set out the scope of a doctor's duty to his or her patient, stating:

> A physician or surgeon who undertakes to render professional services must meet these requirements: (1) He must possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess; (2) he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case; and (3) he must use his best judgment in the treatment and care of his patient. If the physician or surgeon lives up to the foregoing requirements he is not civilly liable for the consequences. If he fails in any one particular, and such failure is the proximate cause of injury and damage, he is liable.

242 N.C. at 521-22, 88 S.E.2d at 765 (internal citations omitted).

In 1976, the General Assembly enacted N.C. Gen. Stat. § 90-21.12, which provides:

> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience

situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

Defendants assert that "this statute effectively supplanted the common law because it stated that all actions alleging medical malpractice in this state are governed by the statutory community standard of care codified in G.S. 90-21.12." This contention is, however, contrary to controlling Supreme Court authority.

In *Wall v. Stout*, 310 N.C. 184, 311 S.E.2d 571 (1984), the Supreme Court addressed a similar argument that N.C. Gen. Stat. § 90-21.12 supplanted the common law standards of care set out in *Hunt*. Like defendants in this case, the plaintiffs in *Wall* argued that "the common law standards of care enunciated in [the Supreme Court's] prior cases are no longer relevant in a medical malpractice action" and "that all other standards and requirements defining a physician's duty to a patient . . . are subsumed" within § 90-21.12. *Wall*, 310 N.C. at 191, 311 S.E.2d at 576. The Supreme Court, however, held "that the adoption of the statute was not intended to accomplish the radical result contended by plaintiff[s]." *Id.* at 192, 311 S.E.2d at 576. The Court explained that it "simply [could not] conceive that by passing this legislation, the General Assembly intended to eliminate the previously existing common law obligations of a physician to his patient." *Id.* The Court, therefore, "conclude[d] that the intended purpose of G.S. 90-21.12 was merely to conform the statute more closely to the existing case law applying a 'same or similar community' standard of care." *Wall*, 310 N.C. at 191, 311 S.E.2d at 576.

Describing this purpose as a "limited" one, the Court then stressed that it "further disagree[d] with plaintiffs that it would be sufficient to instruct the jury that the sole issue relating to a physician's alleged negligence is whether he complied with this statutory standard of care. Our case law makes clear that this is not the extent of the physician's duty to his patient." *Id.* The Court then quoted the three duties set out in *Hunt, id.* at 192-93, 311 S.E.2d at 576-77, specifically noting that the first duty—that a doctor " 'must possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess,' " *id.* at 192, 311 S.E.2d at 577 (quoting *Hunt*, 242 N.C. at 521, 88 S.E.2d at 765)—had been "further refined by language in our later cases defining the 'same or similar communities' standard and by G.S. 90-21.12." *Wall*, 310 N.C. at 192 n.1, 311 S.E.2d at 577 n.1. The Court concluded by holding: "The applicable standard, then, is completely unitary in nature, combining in

*one test* the exercise of 'best judgment,' 'reasonable care and diligence' *and* compliance with the 'standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities.' " *Id.* at 193, 311 S.E.2d at 577 (emphasis original). The Court summarized its holding as "[h]aving determined that G.S. 90-21.12 did not abrogate the common law standards of care required of a physician and that an instruction combining elements of both the *statute* and phraseology from our earlier cases is necessary to fully explain the doctor's duty . . . ." *Wall*, 310 N.C. at 193, 311 S.E.2d at 577.

The Court then proceeded to analyze the jury instructions given in that case. The Court specifically approved the trial court's decision to instruct the jury first that the defendant physician was required to render health care in " 'accordance with the standards of practice exercised by like specialists with similar training and experience who are situated in the same or similar communities at the time the health care service was rendered' " followed by the additional instruction that it was "the duty of the defendant, [physician], to exercise reasonable and ordinary care and diligence in the use of his skill and in the application of his knowledge to the plaintiff's condition and to exert his best judgment in the treatment and care of the plaintiff." *Id.* at 194, 311 S.E.2d at 577-78 (holding that "[t]his was a complete and accurate summation of the defendant physician's responsibilities to plaintiff").

If, at that point in the opinion, any question remained whether N.C. Gen. Stat. § 90-21.12 related to the duty to exercise reasonable care and diligence and the duty to use best judgment, the Court definitively answered that question in addressing the portion of the jury instructions discussing the community standard of care:

We wish to emphasize again, however, that compliance with the "same or similar community" standard of care does not necessarily exonerate defendant from liability for medical negligence. The doctor must also use his "best judgment" and must exercise "reasonable care and diligence" in the treatment of his patient. *Hunt v. Bradshaw*, 242 N.C. 517, 521-22, 88 S.E. 2d [sic] 762, 765 (1955).

If, however, the plaintiff proves a violation of the statutory standard of care which proximately caused her injury, this is sufficient to establish liability on the part of the attending health care professional for medical negligence. It would similarly be

sufficient to establish liability if the plaintiff were able to show that the defendant did not exercise his "best judgment" in the treatment of the patient *or* if the defendant failed to use "reasonable care and diligence" in his efforts to render medical assistance. These three elements here described relate to the doctor's *duty* to his patient, which is not necessarily synonymous with the plaintiff's *burden of proof* in a medical malpractice case. "If [the defendant] fails in any *one* particular [to fulfill his duty to the patient], and such failure is the proximate cause of injury or damage, he is liable." *Id.* at 522, 88 S.E. 2d [sic] at 765. (Emphasis added.)

*Id.* at 199 n.2, 311 S.E.2d at 580 n.2.

In short, our Supreme Court in *Wall* specifically rejected the argument made by defendants in this case. The three duties set out in *Hunt* survived the enactment of N.C. Gen. Stat. § 90-21.12, with only the first duty implicating that statute. Neither the duty to exercise reasonable care and diligence nor the duty to use the doctor's best judgment are restricted by the "similar community" standard of care. This holding of *Wall* has since been reiterated by the Supreme Court and this Court. *See Jackson v. Bumgardner* 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986) ((holding that "[t]he scope of a physician's duty to his patient" is set forth in *Hunt*, and only "[t]he first requirement is further refined by the 'same or similar communities' standard and N.C.G.S. § 90-21.12"); *O'Mara v. Wake Forest Univ. Health Scis.*, 184 N.C. App. 428, 435, 646 S.E.2d 400, 404 ("[*Hunt's*] first requirement is defined in N.C. Gen. Stat. § 90-21.12 (2005)[.]"), *disc. review granted in part, disc. review denied in part*, 362 N.C. 85, 659 S.E.2d 1 (2007) and 362 N.C. 468, —— S.E.2d ——, 2008 N.C. LEXIS 641 (2008).

Defendants, however, cite *Bailey v. Jones*, 112 N.C. App. 380, 435 S.E.2d 787 (1993), in support of their contention. *Bailey* could not, however, overrule *Wall*. Nor is it apparent, when the entire opinion is considered, that this Court's holding in *Bailey* provides support for defendants' position. After pointing out that N.C. Gen. Stat. § 90-21.12 did not abrogate the common law duties set out in *Hunt*, but rather "provided a basis by which compliance with these duties could be determined," *Bailey*, 112 N.C. App. at 386, 435 S.E.2d at 791, this Court used the language relied upon by defendants in this case:

Thus, the physician is required to (1) possess the degree of professional learning, skill, and ability possessed by others with similar training and experience situated in the same or similar

communities at the time of the alleged negligent act; (2) *exercise reasonable care and diligence, in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged negligent act, in the application of his knowledge and skill to the patient's case*; and (3) use his best judgment in the treatment and care of his patient. Failure to comply with any one of these duties is negligence.

*Id.*, 435 S.E.2d at 791-92 (emphasis added). Defendants contend that this recitation of a physician's duties indicates that testimony regarding the exercise of reasonable care and diligence must be in accordance with N.C. Gen. Stat. § 90-21.12. Of course, this language does not support defendants' assertion that opinions regarding "best judgment" are limited by the standard of care set out in § 90-21.12.

Even, however, as to the "reasonable care and diligence" prong of *Hunt, Bailey* ultimately follows *Wall*. After determining that the plaintiff had presented expert testimony that the defendant doctor violated that duty, the Court held that the trial court erred in not instructing on that duty:

The instructions given in this case are insufficient. Our Supreme Court in specifically addressing this issue held that it was insufficient for the trial court to instruct the jury "that the sole issue relating to a physician's alleged negligence is whether he complied with [N.C.G.S. § 90-21.12]." *Wall*, 310 N.C. at 192, 311 S.E.2d at 576. In this instance the jury was instructed that Dr. Jones would be negligent if he "did not act in accordance with" "the standards of practice . . . among family practice physicians with similar training and experience, and who were situated in the same or similar communities at the time Dr. Jones examined the plaintiff in 1988." The use of only the precise language of N.C. Gen. Stat. § 90-21.12 was expressly prohibited by *Wall*, and therefore, the instruction was error requiring a new trial.

112 N.C. App. at 388, 435 S.E.2d at 792-93. Thus, this Court ultimately held in *Bailey* that compliance with the duty of reasonable care and diligence was separate from the standard of care set out in § 90-21.12.

Accordingly, we are bound by *Wall* and must hold that the community standard of care does not apply to the second and third prongs of *Hunt*. Defendants' concerns regarding the consequences of

such a holding are immaterial here since only the Supreme Court may revisit its holding in *Wall*.[2]

II

**[2]** Defendants next argue that the trial court erred by failing to exclude portions of the testimony of two of Mr. Swink's expert witnesses, Dr. Ferdinand Venditti and Dr. Richard Friedman, as a sanction under Rule 26(e) and (f1) of the Rules of Civil Procedure, because those portions of the experts' opinions were not, defendants argue, disclosed during discovery. We review a trial court's decision regarding whether to impose discovery sanctions for abuse of discretion. *Willoughby v. Wilkins*, 65 N.C. App. 626, 642, 310 S.E.2d 90, 100 (1983), *disc. review denied*, 310 N.C. 631, 315 S.E.2d 697-98 (1984).[3] In order to warrant a new trial, defendants must, however, demonstrate that they were prejudiced by the admission of the testimony. *Coffman v. Roberson*, 153 N.C. App. 618, 626, 571 S.E.2d 255, 260 (2002), *disc. review denied*, 356 N.C. 668, 577 S.E.2d 111 (2003).

Defendants primarily object to the fact that although Dr. Friedman and Dr. Venditti discussed in their depositions various criticisms of Dr. Weintraub and breaches of the standard of care, they did not testify specifically in terms of a failure to use best judgment or exercise reasonable care and diligence as they did at trial. A comparison of the deposition and trial testimony reveals that the expert witnesses' critique of defendants' care did not substantially vary from the deposition to the trial. The deposition testimony—even without the phrasing "best judgment" and "reasonable care and diligence"—provided defendants sufficient notice of the witnesses' criticisms of defendants to prepare for trial.[4] In addition, Mr. Swink's written discovery responses gave defendants notice that Mr. Swink was contending that these criticisms violated all three *Hunt* duties.

2. Defendants also argue that the challenged expert testimony regarding Dr. Weintraub's use of reasonable care and diligence and the exercise of his best judgment amounted to speculation regarding Dr. Weintraub's state of mind and invaded the province of the jury. Since defendants (1) failed to object on any of these bases at trial, N.C.R. App. P. 10(b)(1); (2) failed to cite in their brief any authority in support of this contention, N.C.R. App. P. 28(b)(6); and (3) did not include this contention in their assignments of error, N.C.R. App. P. 10(a), this particular issue is not properly before the Court.

3. We note that some of the testimony discussed in defendants' brief was not referenced in defendants' assignments of error and, therefore, is not properly before the Court. *See* N.C.R. App. P. 10(a).

4. We note, however, that Dr. Friedman did specifically refer to a "mistake in judgment" and "bad judgment."

In any event, defendants have not explained why their knowledge of the expert witnesses' criticisms of defendants and the contentions regarding breaches of the standard of care was inadequate for them to effectively prepare for trial in the absence of explicit disclosure from the witnesses that they would testify that these failures also constituted a failure to use best judgment or exercise reasonable diligence and care. We do not believe that the witnesses' failure to couch their criticisms in terms of "best judgment" and "reasonable care and diligence" renders the trial court's decision not to exclude the testimony manifestly unreasonable. *See State v. Thibodeaux*, 352 N.C. 570, 579, 532 S.E.2d 797, 804 (2000) ("Abuse of the trial court's discretion will be found only where the ruling is manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision." (internal quotation marks omitted)), *cert. denied*, 531 U.S. 1155, 148 L. Ed. 2d 976, 121 S. Ct. 1106 (2001).

[3] Defendants also argue that Dr. Friedman and Dr. Venditti testified at trial to previously undisclosed opinions regarding causation and other subjects. Mr. Swink has, however, accurately pointed to the portions of their depositions in which similar testimony appeared or identified testimony from other witnesses, including Mr. Swink's third expert witness, that paralleled the challenged testimony. Defendants have not, in light of the deposition testimony and the trial testimony of other witnesses, demonstrated in what way the trial court abused its discretion or specifically how they were prejudiced at trial by the admission of the testimony. *See Suarez v. Wotring*, 155 N.C. App. 20, 31, 573 S.E.2d 746, 753 (2002) (holding that any error in trial court's admission of expert opinion not disclosed in discovery was harmless when opinion was substantially similar to testimony given by another expert, and appellant did not show how introduction of challenged opinion influenced jury's verdict), *disc. review denied and cert. denied*, 357 N.C. 66, 579 S.E.2d 107 (2003).

Although defendants analogize this case to *Green v. Maness*, 69 N.C. App. 292, 300, 316 S.E.2d 917, 922, *disc. review denied*, 312 N.C. 622, 323 S.E.2d 922 (1984), the defendant in *Green* had notified the plaintiffs just nine days prior to trial that the defendant intended to call a new expert witness who would testify regarding an entirely new medical theory of causation for the minor plaintiff's injury. This case does not, however, involve the presentation of new witnesses or new medical theories. Notably, even in *Green*, this Court concluded that no sanctions were warranted. *Id.* at 299, 316 S.E.2d at 922. Instead,

the Court ordered a new trial based on the denial of plaintiffs' motion for a continuance. *Id.*, 316 S.E.2d at 921.

In contrast to the plaintiffs in *Green*, defendants have provided only a boilerplate statement that they were prejudiced "because they had no opportunity to prepare for cross-examination or rebuttal of testimony regarding the new opinions." Given the fact that defendants have not pointed to any entirely new medical theory presented at trial or specifically explained how they could not prepare for the testimony ultimately presented at trial, we cannot conclude that the trial court abused its discretion in declining to exclude the testimony.

## III

**[4]** Defendants contend that the trial court also erred in admitting Dr. Venditti's testimony regarding his personal preferences and practices in conducting informed consent discussions with his patients. Specifically, defendants point to the following testimony:

Q. Would you discuss the types of things you would discuss in an informed consent discussion[?]

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. Again, the first thing I would do is explain to the patient what the problem is. Something like your pacemaker is not functioning properly, its battery is running down. I then explain to them the procedure to deal with that. So we need to explant the old pacemaker generator, put a new one in. It's an incision under your collar bone to get into the pocket.

I then would talk about the risks and benefits of that. The risks being bleeding, infection, those sorts of things. If we don't do it, the battery is going to run down completely and it's going to stop pacing your heart and you're going to have problems from that perspective.

I would then talk about alternatives. Again, if we do nothing then we would have difficulty with the pacing system becoming non-functional. And then I would say do you have any questions, do you want to ask me anything about this, what I'm proposing that we do.

Defendants assert that the testimony should have been excluded as irrelevant under Rules 401 and 402 of the Rules of Evidence.

**SWINK v. WEINTRAUB**

[195 N.C. App. 133 (2009)]

We first note that defendants did not object when Dr. Venditti was asked about "your practice regarding the performance of lead extractions." Dr. Venditti then proceeded to testify at length, without objection, as to his personal practice when performing a lead extraction. It is questionable, therefore, whether defendants preserved this issue for appellate review. *See State v. Tarlton*, 146 N.C. App. 417, 421, 553 S.E.2d 50, 53 (2001) ("It is well settled that a defendant waives objection to the admission of testimony when testimony of the same import is admitted without objection.").

In any event, the test for relevancy of evidence is whether it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.R. Evid. 401. Although a trial court's rulings on relevancy "are given great deference on appeal," such rulings are "technically . . . not discretionary and therefore are not reviewed under the abuse of discretion standard . . . ." *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991), *appeal dismissed and disc. review denied*, 331 N.C. 290, 416 S.E.2d 398, *cert. denied*, 506 U.S. 915, 121 L. Ed. 2d 241, 113 S. Ct. 321 (1992).

Defendants, in support of this assignment of error, rely exclusively upon *Rorrer v. Cooke*, 313 N.C. 338, 329 S.E.2d 355 (1985). *Rorrer* did not, however, address the admissibility of evidence of an expert witness' personal practices under Rules 401 and 402, but rather held that the personal opinion of an expert witness as to what a professional should have done is not sufficient to establish a breach of the standard of care: "The mere fact that one [expert witness] testifies that he would have acted contrarily to or differently from the action taken by defendant is not sufficient to establish a prima facie case of defendant's negligence." *Id.* at 357, 329 S.E.2d at 367. The Supreme Court in *Rorrer* upheld the trial court's granting of summary judgment because the expert witness' affidavit "fail[ed] to state what the standard of care to which [the defendant] was subject required him to do" and "nowhere state[d] that [the defendant's] inaction violated a standard of care required of similarly situated attorneys." *Id.* at 356-57, 329 S.E.2d at 367. Although the Supreme Court thus held that the expert affidavit was insufficient to prove a *prima facie* case of professional negligence, it never held that the testimony in the affidavit was inadmissible.

Defendants, however, argue that "[b]ecause personal preferences and remarks concerning how experts might have treated the decedent are not evidence of the standard of care, this evidence should

have been excluded pursuant to Rules 401 and 402 of the North Carolina Rules of Evidence." This assertion overlooks the fact that such testimony may be relevant for purposes other than defining the standard of care. *See Wallbank v. Rothenberg*, 74 P.3d 413, 416 (Colo. Ct. App. 2003) ("While [prior cases] make it clear that a standard of care may not be established by the testimony of the personal practices of expert witnesses, those cases do not address whether this testimony may be relevant when other evidence is presented concerning the applicable standard of care."), *cert. allowed*, 2003 Colo. LEXIS 579 (Colo. 2003), *cert. denied*, 2004 Colo. LEXIS 213 (Colo. 2004). For example, our Supreme Court has found relevant testimony of personal practices when used to explain the standard of care. *See Rouse v. Pitt County Mem'l Hosp., Inc.*, 343 N.C. 186, 195-96, 470 S.E.2d 44, 49-50 (1996) (in reversing grant of summary judgment, relying upon testimony of doctor as to "what he normally does as an on-call attending physician" as explaining the standard of care); *see also Wallbank*, 74 P.3d at 417 ("[B]ecause each expert addressed the applicable standard of care, testimony regarding their personal practices was proper direct and cross-examination. Thus, the jury could give whatever weight it determined was appropriate to the testimony of those experts, including ignoring it completely."). Other jurisdictions have held that "testimony regarding an expert's personal practices may either bolster or impeach the credibility of that expert's testimony concerning the standard of care." *Id.*; *see also Bergman v. Kelsey*, 375 Ill. App. 3d 612, 634, 873 N.E.2d 486, 507 ("Our supreme court has determined that the personal practices used by a testifying expert are not relevant and are insufficient to establish the applicable medical standard of care. However, a medical expert's personal practices may well be relevant to that expert's credibility, particularly when those practices do not entirely conform to the expert's opinion as to the standard of care." (internal citations omitted)), *appeal denied*, 226 Ill. 2d 579, 879 N.E.2d 929 (2007).

Defendants' contention in this case that evidence of an expert witness' personal practices is never admissible is not supportable. We need not, however, resolve the question whether in North Carolina such evidence is always admissible. In this case, our review of Dr. Venditti's testimony indicates that it was comparable to the testimony relied upon in *Rouse* and, therefore, the trial court did not err in admitting the testimony.

[5] Defendants further argue, however, that even if the evidence was admissible, the trial court erred by refusing to give their requested

limiting instruction regarding Dr. Venditti's personal preferences and practices. "A trial court must give a requested instruction that is a correct statement of the law and is supported by the evidence." *State v. Conner*, 345 N.C. 319, 328, 480 S.E.2d 626, 629, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134, 118 S. Ct. 196 (1997).

Defendants' proposed instruction reads:

> [Special limiting instruction] Members of the jury, you may have heard some testimony regarding a particular expert witness' personal preference in the practice of medicine or how that particular expert would have performed in a given situation. *Such testimony is not offered to prove or disprove the standard of care applicable to defendants in this case.* Rather, such testimony may be considered by you only in the context of that expert's entire testimony and the weight you choose to give it.

(Emphasis added.) The emphasized language does not, however, precisely state the applicable law. While *Rorrer* establishes that testimony of personal practices, standing alone, cannot prove the standard of care, the proposed limiting instruction does not parallel the holding in *Rorrer*, but rather incorrectly suggests that such testimony is completely irrelevant to the standard of care even when other evidence of the standard exists.

Moreover, even if we assume, *arguendo*, that the trial court erred in not giving the instruction, defendants were required to demonstrate prejudice. *See Outlaw v. Johnson*, 190 N.C. App. 233, 243, 660 S.E.2d 550, 559 (2008) ("Failure to give a requested and appropriate jury instruction is reversible error if the requesting party is prejudiced as a result of the omission."). For an appellant to be prejudiced, the failure to give the instruction must have "likely misled the jury." *Liborio v. King*, 150 N.C. App. 531, 534, 564 S.E.2d 272, 274, *disc. review denied*, 356 N.C. 304, 570 S.E.2d 726 (2002).

Defendants have made no attempt to explain in what way the jury was misled by the omission of the limiting instruction. While defendants argue generally that "[t]estimony regarding personal preferences . . . creates a bogus standard of care by which defendants should be judged," defendants have not pointed to any aspect of Dr. Venditti's description of what he would do in an informed consent discussion that varied from the applicable standard of care.[5] Ac-

---

5. Defendants do not address at all the lead extraction personal practices testimony.

cordingly, defendants have failed to demonstrate that they are entitled to a new trial as a result of the failure to give the requested limiting instruction.

IV

[6] Defendants also contend that the trial court erroneously admitted hearsay testimony, including (1) testimony by Mr. Swink regarding statements of his wife, a cardiologist, and the surgeon who ultimately operated on Mrs. Swink and (2) deposition testimony of a lab technician, Hollie Boswell, regarding statements by another lab technician. Defendants further contend that the trial court should not have admitted testimony of Ms. Boswell regarding when Dr. Weintraub realized that Mrs. Swink's heart had ceased to beat. We address each piece of testimony in order.

First, defendants point to Mr. Swink's testimony regarding the complications surrounding his wife's 1994 pacemaker surgery:

Q. Now, after the procedure was over, describe what, if anything, you learned about complications associated with the procedure[?]

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. After talking with Peggy, it was my understanding that she experienced pulling in her chest. She felt like that her heart was moving in her chest when the leads were being pulled on to be removed. She felt as she was—as if she was being lifted off the table. She also recalled being resuscitated.

Mr. Swink contends that the statement falls within the present sense impression exception to the hearsay rule set out in Rule 803(1) of the Rules of Evidence.

Rule 803(1) renders admissible "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." While Mr. Swink's testimony could be read as indicating that the statements were made just after the 1994 procedure and, therefore, would fall within the exception, we need not resolve that question since defendants have made no showing as to how they were prejudiced by testimony regarding a procedure that was not the basis for the lawsuit. *See Scott v. Scott*, 157 N.C. App. 382, 389, 579 S.E.2d 431, 436 (2003)

(holding that appellant must show that incompetent evidence caused some prejudice). This testimony simply explained why the Swinks were concerned about another lead extraction and duplicated other testimony not challenged on appeal.

**[7]** Defendants next challenge Mr. Swink's testimony reporting what he remembered Dr. Alfred B. Little saying in his deposition:

> I recall that Doctor Little stated that he asked for a surgeon to be called. None came. He asked again for a surgeon to be called and after some time none had arrived. He said he personally went to a phone and called Doctor Gerhardt's service and got in touch with him and had him come to the cath lab.

Dr. Little was an employee of defendant Southeastern at the time of his deposition. Because his statements in the deposition related to matters within the scope of his employment, those statements constituted admissions of a party-opponent under Rule 801(d) of the Rules of Evidence and were admissible.

**[8]** The last of Mr. Swink's testimony challenged as inadmissible hearsay relates to whether Dr. Gerhardt had asked him if he had considered having an autopsy performed:

> Q. Did you have a conversation with somebody about an autopsy?
>
> A. Yes, I did. I had a conversation with Doctor Gerhardt.
>
> Q. What was discussed?
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> A. As I was leaving Peggy the last time, walking out of the room, Doctor Gerhardt was outside the door at a standing desk doing paperwork. And he stopped me and asked me if I had considered an autopsy and I told him that I had not. And he—
>
> [DEFENSE COUNSEL]: Object to the hearsay, Your Honor.
>
> THE COURT: Sustained.
>
> Q. After you had this conversation, what did you decide to do with respect to getting an autopsy?
>
> A. I decided to have an autopsy performed.

While defendants' initial objection was overruled, the trial court sustained defendants' renewed objection regarding the precise testimony at issue, and, thus, there is no issue to be reviewed on appeal.

[9] Defendants next turn to the testimony of Hollie Boswell, a lab technician present during Mrs. Swink's surgery whose deposition was videotaped and played for the jury at trial. Defendants argue that Ms. Boswell's reports of what another lab technician said or observed during the procedure constituted hearsay. The trial court, however, correctly concluded that those statements were admissible to show why Ms. Boswell undertook the actions that she did. As our Supreme Court has explained, "[o]ut-of-court statements that are offered for purposes other than to prove the truth of the matter asserted are not considered hearsay. Specifically, statements are not hearsay if they are made to explain the subsequent conduct of the person to whom the statement was directed." *State v. Gainey*, 355 N.C. 73, 87, 558 S.E.2d 463, 473 (internal citation omitted), *cert. denied*, 537 U.S. 896, 154 L. Ed. 2d 165, 123 S. Ct. 182 (2002).

[10] Finally, defendants contend that the trial court erred under Rule 701 of the Rules of Evidence in admitting the following testimony:

Q. . . . . When did Doctor Weintraub instruct you all to wake Peggy up in relation to his request that the code be called?

A. My recollection, Marcus [Brown] was inquiring about the [oxygen] sat[uration]. I went to check on the sat. At that point, while I'm checking the sat probe, he begins to say, wake her up. I then tried to arouse her and he realized, I assumed at that point, that her heart had ceased to beat. So that point was when he asked for us to call a code.

Defendants argue that Ms. Boswell's assumption that Dr. Weintraub had realized that Mrs. Swink's heart had ceased to beat prior to calling the code was not the proper subject of lay testimony and constituted speculation.

Even assuming, without deciding, that this testimony does not fall within the scope of Rule 701 (governing testimony of lay witnesses "in the form of opinions or inferences"), this testimony was essentially identical to testimony of both Dr. Weintraub himself and Dr. Jeffrey Goodman that Dr. Weintraub had observed that the heart was not beating, that the technicians said Mrs. Swink was not responding, and that Dr. Weintraub then called the code. The admission of Ms. Boswell's testimony was thus harmless.

V

**[11]** Defendants next challenge the testimony of Mr. Swink's economist Dr. Gary Albrecht regarding damages. Rule 702(a) provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." N.C.R. Evid. 702(a). Defendants contend that Mr. Swink "failed to show that Dr. Albrecht had sufficient skill, knowledge, or experience in or related to subject matter [sic] to qualify as an expert and given [sic] testimony on damages."

Mr. Swink tendered Dr. Albrecht as an expert in economics and valuation of lost income without objection from defendants. At trial, prior to being tendered as an expert, Dr. Albrecht testified at length regarding his qualifications to testify, such as his education; his employment history, including the fact that he taught econometrics, economic forecasting, advanced microeconomics, and introductory economics at Wake Forest University; his publications and presentations in the area of forensic economics and involving questions of valuation; and the fact he had previously testified as an expert regarding present value of lost income and services. Because defendants did not object to Dr. Albrecht's qualifications at the time he was tendered as an expert witness, defendants failed to preserve the issue for review on appeal. *State v. White,* 340 N.C. 264, 294, 457 S.E.2d 841, 858, *cert. denied,* 516 U.S. 994, 133 L. Ed. 2d 436, 116 S. Ct. 530 (1995).

To the extent that defendants are contending that Dr. Albrecht was not qualified to render the opinions contained in his testimony and report, that issue "is chiefly a question of fact, the determination of which is ordinarily within the exclusive province of the trial court." *State v. Goodwin,* 320 N.C. 147, 150-51, 357 S.E.2d 639, 641 (1987). Thus, "[w]hen reviewing whether the trial court erred in permitting a witness to qualify as an expert, the appellate court looks for an abuse of discretion." *State v. Steelmon,* 177 N.C. App. 127, 130, 627 S.E.2d 492, 494 (2006). Although defendants assert in conclusory fashion that the trial court abused its discretion in admitting Dr. Albrecht's damages opinions and report, they have not explained in what way Dr. Albrecht—based on his knowledge, skill, experience, training, or education—was not qualified to testify regarding the valuation of lost income or services. This assignment of error is, therefore, overruled.

SWINK v. WEINTRAUB

[195 N.C. App. 133 (2009)]

## VI

**[12]** Defendants next argue that the trial court erred by refusing to give the jury their proposed instruction on informed consent. Defendants requested that the trial court use the informed consent instruction set out in N.C.P.I.-Civil 809.45, which the trial court agreed to do. The following colloquy occurred between the trial court and defense counsel during the charge conference regarding defendants' request for an additional special instruction regarding informed consent based on N.C. Gen. Stat. § 90-21.13 (2007):

> THE COURT: Anything further now from the defendant?
>
> . . . .
>
> [DEFENSE COUNSEL]: Well, just that I did state for the record the request for the instruction that obtaining an executed written consent form for a procedure created a presumption under the law that informed consent had been properly obtained.
>
> THE COURT: Is there—I [have] never seen an instruction like that.
>
> [DEFENSE COUNSEL]: We didn't either, Your Honor. It's in the statute. And that's really the basis for the request.
>
> THE COURT: Have you got a copy of the statute there?
>
> [DEFENSE COUNSEL]: No, sir.

We have been unable to find any indication in the record or transcript—and defendants' brief and assignments of error contain no such citation—that defendants submitted this requested special instruction to the trial court in writing.

N.C. Gen. Stat. § 1-181 (2007) and Rule 51(b) of the Rules of Civil Procedure require that requests for special instructions—*i.e.*, non-pattern jury instructions—must be submitted to the trial court in writing prior to the charge conference. *See* N.C. Gen. Stat. § 1-181 (providing that special instructions must be in writing, labeled as special instructions, signed by counsel, and submitted to the trial court prior to the charge conference); N.C.R. Civ. P. 51(b) (same). Requests for special instructions not made in compliance with N.C. Gen. Stat. § 1-181 and Rule 51(b) may be denied at the trial court's discretion. *See Beroth Oil Co. v. Whiteheart*, 173 N.C. App. 89, 98, 618 S.E.2d 739, 746 (2005) ("Because defendant did not comply with the requirements of Rule 51(b), the trial court acted properly within its discre-

tion in denying the request."), *appeal dismissed and disc. review denied*, 360 N.C. 531, 633 S.E.2d 674 (2006); *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 379, 542 S.E.2d 689, 694 (2001) ("Because defendant did not comply with the requirements of Rule 51(b), the trial court acted properly within its discretion in denying the request."). We see no basis for concluding that the trial court abused its discretion here when defendants did not submit a written proposed instruction, and the evidence was, at best, equivocal whether Mrs. Swink had signed a written consent form that in fact covered the lead extraction.

## VII

[13] Defendants next argue that the trial court erred in its jury instructions by repeating Mr. Swink's seven contentions of negligence following its instruction on each of the three theories of proving medical malpractice. We disagree.

When instructing the jury, the trial court first generally explained a doctor's three duties to his or her patient:

> Every health care provider is under a duty to use his best judgment in the treatment and care of his patient. To use reasonable care and diligence in the application of his knowledge and skill to his patients care. To provide health care in accordance with the standard of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time the health care is rendered.

The trial court then instructed the jury regarding Mr. Swink's contentions as to each of the duties:

> The first contention is that the defendant failed to use his best judgment in the treatment and care of his patient in that the defendant negligently failed to obtain informed consent, negligently failed to stop the lead extraction after encountering excessive scar tissue, negligently failed to consult with a surgeon prior to the lead extraction, negligently failed to prepare Margaret Swink for a pericardiocentesis [sic], negligently failed to use an arterial line, negligently failed to use echocardiographic equipment and negligently failed to treat pericardial tamponade in a timely fashion.

> The second contention is that the defendant failed to use reasonable care and diligence in the application of his knowledge

and skill to his patient's care in that the defendant negligently failed to obtain informed consent, negligently failed to stop a lead extraction after encountering excessive scar tissue, negligently failed to consult with a surgeon prior to the lead extraction, negligently failed to prepare Margaret Swink for pericardiocentesis [sic], negligently failed to use an arterial line, negligently failed to use electrocardiographic material and negligently failed to treat pericardial tamponade in a timely fashion.

The third contention is that the defendant failed to provide health care in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time the health care was rendered in that the defendant negligently failed to obtain informed consent, negligently failed to stop the lead extraction after encountering excessive scar tissue, negligently failed to consult with a surgeon prior to lead extraction, negligently failed to prepare Margaret Swink for pericardiocentesis [sic], negligently failed to use an arterial line, negligently failed to use echocardiographic material and negligently failed to treat pericardial tamponade in a timely fashion.

These jury instructions track the template for medical malpractice instructions set out in N.C.P.I.—Civil 809.00. "This Court has recognized that the preferred method of jury instruction is the use of the approved guidelines of the North Carolina Pattern Jury Instructions." *Caudill v. Smith*, 117 N.C. App. 64, 70, 450 S.E.2d 8, 13 (1994), *disc. review denied*, 339 N.C. 610, 454 S.E.2d 247 (1995). Defendants do not challenge the instruction as a misstatement of the law or as unsupported by the evidence, but rather argue that "the trial judge's overt repetition of the categories of negligence and plaintiff's specific contentions of negligence was extremely prejudicial to defendants," citing *Stern Fish Co. v. Snowden*, 233 N.C. 269, 63 S.E.2d 557 (1951). *Stern Fish* did not, however, involve repetition, but rather an instruction that was deemed "misleading, if not confusing." *Id.* at 271, 63 S.E.2d at 558-59.

Our Supreme Court has, nonetheless, stressed that "jury instructions should be as clear as practicable, without needless repetition." *State v. Trull*, 349 N.C. 428, 455-56, 509 S.E.2d 178, 196 (1998), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80, 120 S. Ct. 95 (1999). On the other hand, the mere fact that a trial court repeats "an otherwise proper instruction does not constitute error." *State v. McDougald*, 336 N.C. 451, 461, 444 S.E.2d 211, 217 (1994) (holding that trial court's rep-

etition of an instruction on flight after each of the three charged offenses did not constitute improper expression of court's opinion).

The Supreme Court has awarded a new trial based on correct instructions only when "the instructions in their totality were so emphatically favorable to [the appellee] that [the appellants] are entitled to a new trial." *Wall*, 310 N.C. at 190, 311 S.E.2d at 575. In *Wall*, as in this case, the trial court had instructed the jury in conformity with the pattern jury instructions, but our Supreme Court determined that a new trial was warranted because of "the exculpatory nature of the pattern jury instructions themselves and to their selections and use by the trial judge." *Id.* at 190-91, 311 S.E.2d at 576.

The instructions in this case do not rise to the level present in *Wall*. Defendants identify nothing inherently wrong with the trial court's reciting plaintiff's contentions regarding how defendants had breached each of the *Hunt* duties. It happened that those contentions were the same for each duty. We do not believe that the trial court's approach in this case can be meaningfully distinguished from the repetition of the flight instruction after each offense in *McDougald*. When the charge is viewed in its totality, we do not believe that the instructions were overly favorable to plaintiff or that the pattern instructions can be viewed as inherently inculpatory, as required by *Wall*.

[14] Defendants also argue that "[f]ollowing a jury question, the court, on its own initiative and without giving counsel an opportunity to object or to be heard, elected to instruct the jury again on the issue of negligence, this time reiterating the three methods of proving negligence and plaintiff's seven contentions." The transcript indicates, however, that when the jury asked to have a copy of the jury instructions, the trial court refused, stating that it preferred to re-read the instructions to the jury. When asked to comment on the trial court's decision to re-instruct the jury, defense counsel responded: "The defendants are content with the Court's position." Defendants did not suggest to the trial court that it omit the factual contentions. The trial court then read the instructions to the jury a second time, although it only listed once the seven contentions as to how defendants breached the three duties. After the instructions were given, defendants then renewed their objection to the trial court's reciting the seven factual contentions.

We do not believe that defendants have adequately preserved for appellate review the issue of re-instruction. In any event, whether to

repeat instructions in response to an inquiry by the jury falls within the discretion of the trial court. *State v. Buchanan*, 108 N.C. App. 338, 341, 423 S.E.2d 819, 821 (1992). Given the jury's inquiry, we cannot find the re-instruction to be the "needless repetition" against which the Supreme Court has warned. *Id.* ("We do not find this instruction to be erroneous nor do we find its repetition to be needless, in light of the fact that it was specifically requested by the jury."). We believe the charge, "when considered contextually as a whole, is fair, correct, and adequate, and is free from prejudicial error." *Jones v. City of Greensboro*, 51 N.C. App. 571, 591, 277 S.E.2d 562, 575 (1981), *overruled on other grounds by Fowler v. Valencourt*, 334 N.C. 345, 435 S.E.2d 530 (1993).

## VIII

**[15]** In the second appeal, defendants contend that the trial court erred by taxing certain costs against them that are not expressly authorized by statute. We must, however, first determine whether the trial court possessed subject matter jurisdiction to enter its award of costs. "The issue of jurisdiction over the subject matter of an action may be raised at any time during the proceedings, including on appeal. This Court is required to dismiss an appeal *ex mero motu* when it determines the lower court was without jurisdiction to decide the issues." *McClure v. County of Jackson*, 185 N.C. App. 462, 469, 648 S.E.2d 546, 550 (2007) (internal citations omitted).

In *McClure*, this Court held that a trial court lacked subject matter jurisdiction under N.C. Gen. Stat. § 1-294 (2007) to enter an order awarding attorneys' fees and costs after notice of appeal had been filed as to the underlying judgment. *McClure*, 185 N.C. App. at 471, 648 S.E.2d at 552. As *McClure* acknowledged, and prior decisions of this Court had held, if an award of attorneys' fees is the result of a party's prevailing as to the underlying judgment, then the issue of attorneys' fees cannot be deemed a "matter included in the action and not affected by the judgment appealed from," N.C. Gen. Stat. § 1-294, and, therefore, the trial court lacks jurisdiction to enter an order awarding attorneys' fees following appeal of the judgment. *See McClure*, 185 N.C. App. at 471, 648 S.E.2d at 551 ("When, as in the instant case, the award of attorney's fees was based upon the plaintiff being the 'prevailing party' in the proceedings, the exception set forth in N.C. Gen. Stat. § 1-294 is not applicable."); *Gibbons v. Cole*, 132 N.C. App. 777, 782, 513 S.E.2d 834, 837 (1999) ("Here, the trial court's decision to award attorneys fees was clearly affected by the outcome of the judgment from which plaintiffs appealed."); *Brooks v. Giesey*,

106 N.C. App. 586, 590-91, 418 S.E.2d 236, 238 (holding that when "a statute such as section 6-21.5, which contains a 'prevailing party' requirement," is the basis for award of attorneys' fees, trial court "is divested of jurisdiction" over request for attorneys' fees by appeal of judgment), *disc. review allowed, disc. review on additional issues denied*, 332 N.C. 664, 424 S.E.2d 904 (1992), *aff'd*, 334 N.C. 303, 432 S.E.2d 339 (1993).

The basis for the award of costs in this case was N.C. Gen. Stat. § 6-1 (2007), which provides: "To the party for whom judgment is given, costs shall be allowed as provided in Chapter 7A and this Chapter." Thus, an award of costs is directly dependent upon whether the judgment is sustained on appeal. Accordingly, under the controlling reasoning of *McClure, Gibson*, and *Brooks*, a trial court lacks jurisdiction to enter an award of costs under N.C. Gen. Stat. § 6-1 once notice of appeal has been filed as to the judgment.

Here, the judgment was entered on 1 March 2007. Defendants filed notice of appeal from that judgment on 20 March 2007. The trial court entered its order on costs on 1 May 2007. Since defendants had already appealed from the judgment, the trial court lacked jurisdiction under N.C. Gen. Stat. § 1-294 to enter the order taxing costs. We note that the judgment stated that "[c]ourt costs will be taxed pursuant to a separate order of this Court." This Court in *McClure*, however, held that such a "reservation" of an issue was not sufficient to permit the trial court to subsequently enter an order on the issue, because "[i]t is fundamental that a court cannot create jurisdiction where none exists." 185 N.C. App. at 471, 648 S.E.2d at 551.

Thus, even though we have, in this opinion, upheld the judgment, we must, because it is a matter of jurisdiction, vacate the order taxing costs and remand for entry of a new order. As this Court suggested in *McClure*, "the better practice is for the trial court to defer entry of the written judgment until after a ruling is made on the issue of attorney's fees [and costs], and incorporate all of its rulings into a single, written judgment. This will result in only one appeal, from one judgment, incorporating all issues in the case." *Id.*, 648 S.E.2d at 551-52.

No error in part and vacated and remanded in part.

Chief Judge MARTIN and Judge STROUD concur.